2025 IL App (2d) 230086-U
No. 2-23-0086
Order filed January 22, 2025

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Kane County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 14-CF-1229 |
| SHADWICK R. KING, | ) ) ) | Honorable John A. Barsanti, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

PRESIDING JUSTICE KENNEDY delivered the judgment of the court.
Justices Jorgensen and Birkett concurred in the judgment.

**ORDER**

¶ 1    *Held*: Defendant was not denied a fair trial, and the evidence was sufficient to convict defendant of first-degree murder beyond a reasonable doubt. Therefore, we affirm.

¶ 2    Following retrial, defendant, Shadwick R. King, appeals from his first-degree murder conviction for the death of his wife, Kathleen M. King. On appeal, he argues that he did not receive a fair trial and that the evidence was insufficient to prove first-degree murder beyond a reasonable doubt. For the following reasons, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4     On the morning of July 6, 2014, defendant's wife, Kathleen, was discovered lying unmoving on train tracks near the Geneva Metra station by Metra passenger-train operators. Authorities declared her dead at the scene.

¶ 5     On July 11, 2014, the State charged defendant by information with two counts of first-degree murder (720 ILCS 5/9-1(a)(1), (2) (West 2014)) for the death of Kathleen. On September 15, 2014, the information was superseded by indictment on the two counts of first-degree murder. Defendant's case proceeded to a jury trial, which commenced on March 2, 2015.

¶ 6                                    A. First Trial

¶ 7     Defendant's jury trial resulted in a guilty verdict for the first-degree murder of Kathleen, and he was sentenced to 30 years' imprisonment. Defendant appealed, and this court reversed and remanded for a new trial. *People v. King*, 2018 IL App (2d) 151112, ¶ 1. We reversed because we held that it was prejudicial error to permit the testimony of the State's expert, Mark Safarik, including his opinion that Kathleen was manually strangled. *Id.* ¶¶ 79, 89. However, we found the evidence was sufficient to support that Kathleen's death was the result of criminal agency, and therefore defendant's retrial was not barred by double jeopardy. *Id.* ¶ 66.

¶ 8     Defendant petitioned for leave to appeal to the Illinois Supreme Court, and the supreme court granted his petition. *People v. King*, 2020 IL 123926, ¶ 1. The supreme court affirmed the appellate court in part and reversed it in part. *Id.* ¶ 56. It agreed that Safarik "never should have been allowed to testify as an expert in this case" and concluded that his testimony was inadmissible in its entirety and was not harmless. *Id.* ¶¶ 36, 38.

¶ 9     The supreme court further held that the State's evidence was sufficient to prove defendant's guilt beyond a reasonable doubt such that his retrial was not barred by double jeopardy principles.

*Id.* ¶ 51. The court explained that the medical opinion of the State's expert, Dr. Mitra Kalelkar, that Kathleen died of manual strangulation, was sufficient to convict defendant, and that the State had provided "ample circumstantial evidence from which a rational trier of fact could reach the conclusion *** that Kathleen's death was produced by criminal agency and that defendant [was] the person responsible." *Id.* ¶ 53. It reversed only as to those portions of the appellate court's decision holding (1) that the trial court should have excluded a witness's brief foundational testimony about her close relationship with Kathleen and (2) that the State's closing argument attempted to define and dilute its burden of proof. *Id.* ¶ 55. The supreme court remanded the cause to the circuit court for a new trial. *Id.*

¶ 10                                    B. Second Trial

¶ 11     Following remand, defendant's bench trial commenced on June 6, 2022. The State's theory of the case was that defendant strangled Kathleen to death and tried to cover up her murder by dressing her as if she were going for an early morning run, transporting her body, and placing it on a nearby railroad track. The defense's theory was that Kathleen died of a sudden cardiac arrhythmia brought on by excessive alcohol consumption. The defense intended to present location data from Kathleen's cell phone and evidence from an examination of her shoes that, together, showed that she had walked or ran to her final destination on the railroad track. It also intended to call an electrophysiologist to testify to her cause of death, whose testimony was not produced at the first trial.

¶ 12     The evidence adduced at trial can be broken down broadly into the following five categories: (1) the State's evidence about defendant and Kathleen's relationship; (2) the discovery of Kathleen's body; (3) the subsequent investigation into Kathleen's death; (4) the defense's lay

witness testimony, including defendant's own testimony; and (5) expert witness testimony, including competing medical opinions from the State and defense explaining how Kathleen died.

¶ 13                    1. Defendant and Kathleen's Relationship

¶ 14    Kristine Casey was Kathleen's younger sister by five years, and she testified as follows. At the time of trial, she was 35 years old, and Kathleen had been 32 years old when she died on July 6, 2014. She and Kathleen had been very close.

¶ 15    Kathleen and defendant married in May of 2004, and defendant was 14 years older than her. Prior to July 6, 2014, Kristine described Kathleen and defendant's relationship as "fine" and friendly but not as close. Kathleen and defendant had three boys together: Brandon, Nathan, and Justin, who were respectively 17, 15, and 13 years old at the time of her testimony. In July 2014, Kathleen and defendant were living at 817 Oak Street in Geneva.

¶ 16    Kristine recalled that Kathleen began wearing glasses and contacts as a teenager for nearsightedness. Kathleen would wear her contacts during the day, and if she and Kristine would talk at night, Kathleen would wear her glasses. She would put her contacts in first thing in the morning. She also testified that Kathleen was a runner, and they had talked about running because Kristine also used to be a runner.

¶ 17    In the five or six months before Kathleen's death, she had been away from Geneva to attend training for the Army Reserves, both basic training and advanced individual training (AIT). She had left for basic training in Missouri on February 10, 2014, graduated on April 24, then went to Texas for AIT, before returning home to Illinois on June 13.

¶ 18    After Kathleen returned from AIT, Kristine first saw Kathleen again at a Father's Day barbecue on June 15, 2014. Defendant was also there, and he seemed normal. Kathleen seemed

happy and was not distressed at all. Kathleen was drinking that day; she had around four or five beers.

¶ 19   On the night of June 20, 2014, she and Kathleen were texting and continued to text into the early morning of the next day. At around 1 a.m., Kristine said she was going to sleep, but Kathleen called her about five minutes after they stopped texting. She asked Kristine, "Can you tell him I was on the phone with you?" Kristine could tell that the phone was on speaker and that defendant was also present on the call because, when she confirmed that it was her on the line, she heard defendant say, "Well, what would you think? What would you think?" Defendant sounded frustrated.

¶ 20   On June 22, Kathleen asked Kristine if they could go out to eat together, but Kristine had to work. Around midnight that day, Kathleen called and asked her for directions from Wrigley Field to their father's house. Kathleen had been at the Cubs game with military people, and the only person she specifically mentioned was Billy Keogh. At the time, that was not a name Kristine recognized. Kathleen told her Billy was a friend, and Kristine did not know whether there was something physical between Kathleen and Billy. A few days later, Kathleen asked Kristine to say they were together at the Cubby Bear on the 22nd, in case anyone asked her about that day.

¶ 21   On June 26, she and Kathleen went to Ravinia to see a concert with Tim Casey, who was Kristine's fiancé, and defendant. During that night, Kathleen would take long absences going to the restroom, which was unusual for her. Kathleen seemed happy and flirty, but defendant was not in a good mood. Both she and Kathleen were drinking at the concert. Kathleen had probably five beers, which was slightly more than normal for her to drink.

¶ 22   On July 5, the day before Kathleen died, Kristine spoke with her twice on the phone. Kathleen sounded happy and unstressed; they were planning on going to their father's house in

Elk Grove for a Fourth of July barbecue celebration. Kristine attended the barbecue with Tim, arriving around 6:45 p.m., and defendant and Kathleen came with their three boys.

¶ 23　Kristine interacted with Kathleen regularly over the four hours she was at the barbecue. They were planning Kristine's wedding shower because she was getting married in October. That night, Kathleen did not seem stressed, and she was wearing a pinkish T-shirt, jean shorts, and flip flops. Kathleen was drinking that night. She had a bottle of wine and maybe a glass or two more.

¶ 24　Defendant and Kathleen stayed at the barbecue until 10:45 p.m., and they left together. Their boys stayed with their grandfather, as planned. Kristine did not see any injuries to Kathleen when she left.

¶ 25　The next day around 10:15 a.m., Kristine tried to call Kathleen because they had plans to see their grandma, but she did not answer. Around 10:50 a.m., she received a Facebook message from defendant asking her for her father's cell phone number. She had never received a text message or Facebook message from defendant before, and she found it unusual. She called Kathleen's cell phone again, and a man answered, who she later learned was Detective Pech from the Geneva Police Department. He informed her that Kathleen was dead.

¶ 26　She and Tim headed to her father's house, where many emergency vehicles and defendant were present. She observed defendant outside her father's house, and she described his demeanor as "flat."

¶ 27　On cross-examination, Kristine agreed with defense counsel that she and Kathleen occasionally had fun going to bars and drinking together, but she denied that she had concerns that Kathleen had a drinking problem. After going with Kathleen to Ravinia on June 26, they went out to a bar, where Kathleen had another beer or two (after having five at the concert). Kristine did not see Kathleen get sick that evening, but she did learn later that she got sick and threw up after the

night at Ravinia. She said that if Kathleen drank that much, it was normal that she would get sick, but she did not always drink that much.

¶ 28    Tim Casey, Kristine's husband, testified as follows. He had a close relationship with Kathleen, and he recounted the events of the summer of 2014 similarly to those recounted by Kristine in her testimony. At the Ravinia outing on June 26, 2014, he spoke privately with defendant, who told him that he did not think he would be at Tim and Kristine's wedding in the fall. Tim asked him why, and defendant replied that he and Kathleen were having marital problems and apologized that he would not be at the wedding. After Ravinia, they went out to Emerald Isle in Chicago, and defendant asked him whether Kristine was with Kathleen on June 22. Tim lied, saying that they were together at a Cubs game, and he believed defendant knew he was lying.

¶ 29    At the July 5, 2014, barbecue, Tim testified that both Kathleen and defendant were drinking. Defendant had at least a few beers. He spoke with defendant, and he recalled a conversation about defendant and Kathleen getting into an argument a few nights prior. Both defendant and Kathleen mentioned that they had been arguing, with one of them joking that Kathleen had tried to choke defendant. Defendant had elaborated that he would never hurt a woman.

¶ 30    Brandon King, who was Kathleen and defendant's son, testified that he was currently 17 years old and in his junior year of high school, and he had been 9 years old in the summer of 2014. He remembered that when his mom would go on a run, she would wear an armband to hold her phone and she would listen to music with earbuds. He remembered going with her on some of her runs; he would usually play in the park. He did not remember her ever running on or by the railroad tracks. His mom had regularly worn contacts and glasses.

¶ 31    Brandon recalled a trip in June 2014 to defendant's father's house, shortly after Kathleen returned from her Army training. It was "deep in Illinois," and he, his brothers, and his parents drove there in their blue Dodge Durango. While on the trip, they were near a pond, and defendant threw Kathleen's phone into the pond. He did not remember giving an interview in July 2014, where he told the interviewer he was scared at the time, that defendant was swearing at Kathleen, and that defendant thought she was cheating on him.

¶ 32    Kurt Kuester was Kathleen and Kristine's father. He also had a son, Michael. At the time of trial, he had lived in Arlington Heights for five years, but prior to that he had lived in Elk Grove Village, including the summer of 2014.

¶ 33    Kurt testified that, at the barbecue on July 5, 2014, the topic of Kathleen's children staying the night was broached, and it was decided that they would stay overnight. The boys spent the night "[r]elatively often." The plan was for Kathleen to meet the boys at his mother's house the next day. He testified that Kathleen appeared "[b]ubbly, excited, having a good time just being with family," and he never observed any bruises or abrasions on her, nor any dirt on her legs or leaves in her hair. Defendant, in contrast, seemed "withdrawn."

¶ 34    The next morning, Kurt took Kathleen's boys to a restaurant for breakfast around 9 a.m. They returned home around 10:30 or 11 a.m., and within minutes of being home, he received a phone call from Kristine that Kathleen was dead. Shortly thereafter he saw defendant in the driveway. It was "[e]xtremely" unusual for defendant to come to his house alone because he never picked up the boys after they stayed over. From the front door, Kurt asked defendant where Kathleen was, and defendant answered that she went for a run at 6:30 a.m. to clear her head and that they were fighting. Kurt confirmed that defendant specifically said 6:30 a.m. Kurt then said that the police had said that Kathleen was dead, and he testified that defendant responded, "I didn't

do anything, I didn't do anything." Kurt replied that he better not have hurt her, and he went back inside the house. Defendant never asked him what happened to Kathleen.

¶ 35    After Kurt's testimony, the State presented witnesses and exhibits concerning Kathleen and defendant's time at the Dam Bar and Grill (Dam Bar) in Geneva, beginning around 11:25 p.m. on July 5 and continuing into the early morning of July 6. In July 2014, Anna Modaff was a bartender at the Dam Bar when defendant and Kathleen entered on July 5. She served defendant and Kathleen drinks: five bottles of Miller Light to defendant and four glasses of wine to Kathleen. She also testified that Kathleen ate some chips and salsa. Anna continued that, during their time at the bar, defendant and Kathleen had a conversation with another patron, Chad Lunsmann.[1] Chad ordered a round of shots for her, defendant, himself, and his wife. Anna testified that defendant left around 1:30 a.m., and although she did not personally see Kathleen leave with him, she believed that she did, and Kathleen was no longer at the bar by close.

¶ 36    Paul Schennum was a patron at the Dam Bar on the night of July 5, 2014. He testified that he spoke with defendant and Kathleen at the bar, and Kathleen began by joking that she could beat up anyone at the bar. She was in a good mood, but defendant was a lot quieter. She also told him about her three children. He spoke with them for about two and a half hours, and he did not notice any bruises or injuries on Kathleen.

¶ 37                    2. Discovery of Kathleen's Body

---

[1]Chad Lunsmann had been defendant's neighbor in Geneva, and the parties stipulated to his testimony from defendant's first trial because he died prior to defendant's new trial. He testified that he saw defendant and Kathleen at the Dam Bar sometime after midnight on July 6, 2014. Kathleen was in good spirits and defendant seemed like his normal self. They all left the bar together near closing time, and they gave him a ride home. He did not observe any injuries to Kathleen.

¶ 38    Kathleen's body was discovered around 6:38 a.m. on July 6, 2014, by Metra employees on a Metra passenger train. Her body was discovered lying on the south railroad track east of the Geneva Metra station, and paramedics were called to the scene.

¶ 39    The State read into evidence the stipulated testimony of Deven Satchell from defendant's first trial. He was a locomotive engineer for the Union Pacific Railroad. On July 6, 2014, he was driving a freight train eastbound to Chicago, approaching the Geneva station at around 6:02 a.m. As he passed through the Geneva station area, he did not see anything lying on the tracks, nor did he see any people or cars in the area. He had never seen anyone running on the railroad tracks in that area.

¶ 40    Robert Soto was a Union Pacific Metra engineer on July 6, 2014, working on a Metra passenger train with Alex Perez, who was his student. Their passenger train was traveling eastbound on the north track around 6:30 a.m., and it pulled into the Geneva Metra station around 6:36 a.m. Soto had never seen anyone jogging on the railroad tracks in the 10 years prior to July 6, 2014, nor had he seen someone since.

¶ 41    Around 6:38 a.m., the train was passing Illinois Route 25 when Perez "noticed that it looked like a body up ahead on track 2," which was the south track. Soto also observed the body after Perez brought it to his attention. Perez slowed the train down and blew the whistle. As they approached the body, Soto testified that the body was not moving. When they passed the body, he could tell it was a female and testified that "[w]e seen [*sic*] the body with the head laying on the north rail and the arm was kind of positioned in an awkward way, it didn't seem right." He testified that her eyes were kind of slit open but "like blank." After they passed the body, Perez made an emergency stop of the train. Soto never saw the body move, and he did not see any other people

or cars in the area of the body. After the train stopped, Soto called the Union Pacific dispatcher, in part to make sure a train did not come along the south track and hit the body.

¶ 42     Joel Cavendar was the brakeman on the Metra train that stopped for Kathleen's body on the morning of July 6, 2014. After stopping the train around 6:39 a.m., Cavendar walked towards the body on the tracks. He was initially about 20 feet from the body and eventually moved to about 5 feet away. He never saw the woman's body move or breathe. He noticed that her shirt was pushed halfway up her back, that her neck was on the rail, and that one arm was "kind of contorted under her body," with her other hand in front of her. The woman also had leaves and sticks in her hair. A cell phone was near the body. Cavendar did not try cardiopulmonary resuscitation (CPR) because "[s]he clearly looked like she was deceased." During his around 20 years of employment with Metra, he had never seen someone jogging on the railroad tracks. He did not see anyone else in the area, and he did not see a blue Dodge Durango.

¶ 43     Dan Mongelli was the conductor of the Metra train on the morning of July 6, 2014. After the train stopped, Mongelli exited with Cavendar and approached the body on the tracks. He approached by walking on the wood planks of the track because it was "more sure-footed." The first thing he noticed was the way the woman's body lay over the rail, with her head draped over the rail. When he was 50 to 70 feet away, he saw the clothing move—the wind was blowing—but did not see any definitive movement of the body. He was hoping the woman was still alive. As he continued to approach her, he never saw her move or breathe. Like Cavendar had, Mongelli observed a pink cell phone near the body, inside the rail, and debris in the woman's hair. He got within two feet of the body, and he looked at her face. He saw no signs of life, confirming that he saw no breathing or movement and noting that the body was lying "in an unorthodox fashion, with slight discoloration" on the mouth and legs—a purplish color. He never performed CPR or touched

the body, explaining that "a deceased body is not for me to touch." Mongelli eventually stepped away from the body and waited for police to arrive.

¶ 44    On cross-examination, defense counsel read Mongelli's testimony from the first trial, where he relayed via radio that "I thought I might have seen some breath but she was contorted, but she almost looked dead," while he was near the body. The defense's audio recording exhibit confirms that Mongelli relayed at one point that he thought he saw her breathing. On redirect examination, Mongelli clarified that he had used the past tense regarding his report of seeing her breathing because, although he had thought he had seen her breathing while approaching her, he never saw any indication that she was actually breathing other than seeing her shirt move in the breeze.

¶ 45    George Carbray was a police officer for the City of Geneva, and he received a dispatch around 6:48 a.m. on July 6, 2014, about a female subject on the railroad tracks between Kirk Road and the Route 25 overpass. Carbray arrived at the body at 6:55 a.m., and he observed a female on a rail "oriented from the [crown of the] head towards the south and her feet towards the north." He testified that she was lying on her left side, twisted at the torso, with her head and neck lying on the rail with her shoulder touching the rail. He also saw a pink cell phone inside the rail.

¶ 46    Carbray testified that, when he reached the body, he did not detect any signs of life, such as breathing, and he noted discoloration of the body. Her skin was "very grayish and not pink like a normal person who is living would be." Based on his training, he believed the body showed signs of lividity on the left leg, especially at the bottom of the visible thigh area. He explained that lividity was "the pooling of blood, after the blood stops circulating, that causes the skin to be grayish or bluish in color."

¶ 47    After making his visual observations, Carbray checked her neck for a pulse, and she did not have a pulse. He then gently shook her shoulder to test for a response, but he received none. At 6:56 a.m., Carbray determined that the woman was deceased, and he relayed that information via radio. He did not try any lifesaving measures because "it appeared that she had been deceased for a while." He had been to a scene with a dead body approximately 100 times before. Emergency medical services arrived on scene within six or seven minutes of Carbray. He identified several photographs of Kathleen's body at the scene, including those depicting what he identified as lividity. Carbray did not observe blood at the scene or injuries to her body. On cross-examination, Carbray agreed that the ballast rocks by the railroad tracks were difficult to walk on because they were an uneven surface.

¶ 48    Gary Grandgeorge was a paramedic with the Geneva Fire Department on July 6, 2014. He testified that he received a dispatch at 6:53 a.m. that morning, and he responded with his partner, Ryan Deitlin, who was also a paramedic. When he arrived on scene around 7:07 or 7:10 a.m., he saw a female lying on the railroad track with her face on one of the rails. He did not observe any obvious injuries, like a stab wound, gunshot wound, or blunt trauma. Her skin was "very pale," she had no pulse, and he noticed some signs of lividity on her legs, specifically on the left leg, from calf to thigh. Lividity was the pooling of blood from the blood not being pumped around the body, and the presence of it in her leg would have been the result of gravity pulling it there, as she was lying on her left side. Lividity did not occur in a living person, because the heart would be pumping and circulating blood around the body; it would take some amount of time to show up. Deitlin also told him that she had some stiffness (Deitlin touched the body, but Grandgeorge did not). In his opinion, the woman he observed on the track was dead.

¶ 49 Grandgeorge continued that Deitlin set up a heart monitor on the woman's body. The monitor showed no heartbeat, only electrical activity. He explained that the electrical activity meant "that the body was calling for a heartbeat electrically but there was no heartbeat," which was called pulseless electrical activity. Although the woman was not asystole, in that she was not flatlining on the monitor, he did not see anything that indicated the woman had a working heart—a working heart would have had more electrical activity, an organized rhythm, and a pulse. Based on his training and experience, Grangeorge explained that electrical activity in the body does not stop the moment a person dies. He did not attempt to resuscitate the woman because she was not breathing, had no pulse, displayed lividity, and she had been down around 14 minutes since they had been dispatched.

¶ 50 Grandgeorge called Delnor Hospital and spoke with Diane Kistinger, a nurse. He believed that he mentioned the electrical activity from the heart monitor. Kistinger obtained a pronouncement of death from Dr. Carlos Duarte and relayed to Grandgeorge the time of death, 7:22 a.m.

¶ 51 On cross-examination and redirect examination, Grandgeorge differentiated between clinical death and biological death. He described clinical death as "[n]o signs of any life sustaining breath, pulse," whereas biological death meant organ failure. Although a person in clinical death could be resuscitated, such as by restarting the heart, "there's a limit to that," and organs would begin dying as soon as they were not oxygenated by blood flow.

¶ 52 Michael Antenore, the Fire Chief for the City of Geneva Fire Department, testified that he had been a firefighter and EMT for over 20 years. On July 6, 2014, he was a lieutenant who responded to a dispatch around 7 a.m. that morning. He picked up Grandgeorge and Deitlin from the parking lot by Esping Park and transported them in his pickup truck closer to the scene at the

railroad track. Antenore approached Kathleen's body around 7:10 a.m., moving to within about one foot of her body. He could tell the body was female, and he did not see the body breathing. The body was discolored: it had a purple skin tone. Based on the purple skin color, Antenore concluded that blood was not circulating.

¶ 53    On cross-examination, Antenore agreed that vehicle access to the railroad tracks was limited. He drove briefly on grass after crossing a bridge to get near the tracks, stopping on a grassy field area and walking the rest of the way. Antenore testified that it had rained that morning, and the ground was soft and moist. His vehicle left deep tracks in the mud, but he did not notice any other tire tracks in the area. His boots also got muddy walking to and from the tracks. He did not see mud on the Kathleen's shoes; he saw only a little bit of dry dirt.

¶ 54                            3. Police and Forensic Investigation

¶ 55    Two police officers processed the scene at the railroad tracks: Clinton Montgomery and Matthew Hann. Montgomery testified as follows. On July 6, 2014, he was an evidence technician who, along with Hann, was called to the scene by Carbray. His duties were to document the scene with photographs, take measurements, and collect evidence.

¶ 56    Montgomery arrived at Kathleen's body at about 7:12 a.m., and she was lying on her left side with her neck across the northernmost rail of the southern railroad track. She was wearing a T-shirt, shorts, and athletic shoes. Her skin and face were grayish, and he noticed the body displayed lividity, primarily on the legs. He found a cell phone close to her body. The phone was "approximately like a foot from her head."

¶ 57    Montgomery identified several pictures of Kathleen taken at the scene, which he began taking around 7:24 a.m. Some of his photographs showed a pink iPhone resting screen-side down on top of railroad spikes inside the railroad track near Kathleen's head. Other photographs depicted

what he described as lividity. Further pictures showed a scar on her right thigh, a strand of hair on the outside of her right knee, and a couple leaves and a blade of grass in her hair. He also photographed some scrapes on her shins but without any blood associated with the scrapes.

¶ 58   At one point during his investigation of the scene, he and Lisa Krieghbaum,[2] a deputy coroner from the Kane County Coroner's Office, rolled Kathleen's body over by grabbing her right shoulder and rolling her onto her back. When they rolled her over, he noticed that her shirt was pulled up over her bra, and the bra was "kind of pulled up over her breast exposing her breast." He did not believe that how they rolled her over caused her shirt or bra to pull up. The drawstring on the shorts was not tied, and she was not wearing underwear under the shorts. When he and Hann checked her shorts, they found a piece of a leaf just above the pubic region.

¶ 59   Montgomery took more pictures after she was rolled over. Kathleen had no signs of trauma on her face, but he noticed a bruise on her left bicep, which he photographed. As depicted in one photograph, he noted a "trail of saliva that went down from her mouth to her left jaw area." It was a brownish color. She also had a smudge under her left eye and a small abrasion on her left knee, along with some indentation marks on the outer side of her left knee area. Her teeth were intact.

¶ 60   Krieghbaum eventually placed the body in a bag and removed the body from the scene. Montgomery and Hann then returned to the police station, where Montgomery dusted the pink iPhone for fingerprints. He was wearing gloves and dusting to see whether there were usable prints on the phone. While dusting the phone, a notification popped up on the screen indicating a missed call and voicemail from defendant. The dusting of the phone yielded no usable fingerprints.

---

[2]At the time, her name was Lisa Gilbert, Gilbert being her maiden name.

¶ 61    Montgomery and Hann had noticed "some kind of reddish color accumulation on the bottom of the soles of our boots," after working the scene. Montgomery did not notice the same color on Kathleen's shoes, corroborated by his picture of her shoes.

¶ 62    On cross-examination, Montgomery agreed that the color was a rusty color, and he believed that the color came from the reddish colored rocks or possibly the railroad track. Defense counsel also asked him, "you didn't think at any time, this is odd, it's a staged homicide, did you?" Montgomery answered no.

¶ 63    Detective Matthew Hann, after testifying consistently with Montgomery's account of their investigation of the scene on July 6, 2014, testified that he was present for Kathleen's autopsy on July 7, 2014. The autopsy was held at the Du Page County Coroner's Office, and several other people were present: Lisa Krieghbaum, Detectives Pech and Jerdee, forensic investigator Rusty Sullivan, and forensic pathologist Mitra Kalelkar. Hann's duties were to photograph Kathleen before, during, and after the autopsy and to collect any evidence from the body, such as the clothes removed from her body. Regarding Kathleen's clothing, Hann noted that the band of the bra under the left armpit was "completely twisted" and stated it was twisted prior to the bra being clasped. The bra also was not fitted properly in that it was tight across the breasts, with the bottom of the bra across the midsection of the breasts, exposing the lower breasts and nipple area. Her shorts were loose. Her right sock did not fit properly on her foot in that it was twisted, and there was a clump of hair between her foot and the sock. Her shoes were tied with a single knot.

¶ 64    On cross-examination, Hann agreed with defense counsel that, when he was on scene on July 6, 2014, he never concluded that it was a staged homicide scene. He also agreed that he revisited the scene two days later and observed tire tracks, but those tracks did not match a Dodge Durango.

¶ 65    The State recalled Hann later in the trial. He testified that he recovered wired earbuds from Kathleen's purse recovered from her and defendant's home on 817 Oak Street. Furthermore, on August 28, 2014, he assisted in the execution of a search warrant at 817 Oak Street, along with Detectives Pech and Frieders and Evidence Technician Olson. Hann's responsibilities during the warrant execution were to photograph the residence and collect any evidence as directed by the detectives. On top of the washing machine, he found a Belkin armband for holding a cell phone, typically by strapping it to the upper arm so that headphones could connect to it. He also found several boxes of unused soft contact lenses in the closet of the first-floor hallway.

¶ 66    On cross-examination, counsel asked Hann whether he was aware of the theory that defendant's shoes were double-knotted, whereas Kathleen's were single-knotted. Hann was aware of it at the time of trial, but he was not sure whether he was aware of the theory in the past. The State objected to the defense's line of questioning about double versus single knots, but the trial court overruled the objection, explaining that "whether or not [her shoes] were tied in a single knot or a double knot is relevant," although the court as the factfinder had made no determination yet whether such evidence was persuasive.

¶ 67    Investigator Angela Garza was an Elk Grove police officer on July 6, 2014. Along with her partner, Officer Perkins, she responded to a complaint by Kurt Kuester at his house around 11:35 a.m. that day. When she arrived on scene, she met with defendant, who was in the driveway, while her partner met with Kurt. Garza asked defendant what was going on, and he responded that he was there to pick up his kids. She asked why he was there without his wife, and he said that before picking up the kids, he and his wife had gotten into a dispute over a man she had met at basic training.

¶ 68    Defendant continued telling Garza that Kathleen had been speaking to the man for about a month, and before defendant left, he had told Kathleen to choose him or the other man. Defendant said he had last seen Kathleen around 6:30 a.m., when she went for a run. Garza described defendant as "flustered" and breathing heavily. She advised defendant that she would be transporting him to the Geneva Police Department but that he was not under arrest. On the ride to the station, defendant asked one question: How did his wife die? Garza said she did not know.

¶ 69    Officer Robert Pech was a police officer with the City of Geneva, and he was assigned as the lead detective investigating Kathleen's death. He testified that Kathleen's home at 817 Oak Street was about 1,200 feet away from where her body was found. He identified three access points to the railroad tracks where Kathleen was found: from Sandholm Street, which had an access gate to a gravel road running parallel to the tracks; through an area of thick vegetation just north of Kathleen's body, accessible via a foot bridge; and through a break in the tree line from Esping Park. Although some tire tracks were found by the third access point, he was able to rule out defendant's vehicle as the cause of the tracks.

¶ 70    Pech interviewed defendant around 1 p.m. on July 6, 2014, at the Geneva Police Department. Detective Brad Jerdee was with Pech when he interviewed defendant. Pech testified that the lower portion of defendant's right lip "appeared swollen." When defendant was booked a few days later on July 11, the swelling on his lip appeared to have disappeared.

¶ 71    Pech and Jerdee's interview of defendant was audio and video recorded, and the recording was played for the court. In defendant's interview, he told the officers that he and Kathleen had gone to the Dam Bar last night and had left to go home around 1:45 a.m. Defendant continued that "we'd been having—we were kind of separated, but not in a bad way. I don't know how that sounds." Pech followed up on what defendant meant by "separated," and defendant answered that

"[s]he's been seeing somebody else because she just got out of basic training in the Army *** and she had met somebody." He did not know Billy's last name at the time, saying it was "Keno, something like that." He knew that they had gone to a Cubs game together a few weeks prior, and he and Kathleen had talked about it. He told Kathleen that she needed to make a decision. He knew about the Cubs game because of text messages and Facebook.

¶ 72    Defendant also told the officers that Kathleen did not want a divorce. Kathleen had told him that her relationship with Billy was not sexual, and he "[s]orta" believed her, but he "knew things weren't great." He had "had sleepless nights worrying about what's going on *** but there's not much you can do about it, there really isn't." He admitted to taking Kathleen's phone from the bathroom early that morning and texting Billy around 4 a.m. from her phone to let him know to "leave my wife alone, you know."

¶ 73    Defendant stated that Kathleen loved to run and went for a run between 6 and 7 a.m. that morning. He stated that Kathleen had no health issues; she was as healthy as can be.

¶ 74    Defendant continued in his interview that, around 7:30 a.m., he went to Jewel and to get gas, returning home around 8:30 a.m. Sometime thereafter he left to pick up his children because he "wanted to be with [his] kids." Nobody appeared to be home when he first arrived at Kurt's house, so he went to Kathleen's grandmother's house. At the grandmother's house, he messaged Kristine to ask for Kurt's phone number. He wanted to know where the kids were and whether he should stay or come back to Kurt's house. He said he also called and texted Kathleen around 9:30 a.m.

¶ 75    When Pech asked about defendant's lip, he responded, "Dry lip." Pech said no, it was a fat lip, and defendant denied that it was. He also denied having a mark on his lip.

¶ 76    Pech and Jerdee interviewed defendant again on July 8, 2014, following the results of Kathleen's autopsy, and the recording was again played for the court. In the July 8 interview, defendant was advised of his *Miranda* rights. Defendant stated that, on the morning of July 6, he needed to take out some money to fix his car. He did not want Kathleen to take out all the money from the account. At that point in time, he was thinking that he had to separate himself from her. He went to a Chase bank in St. Charles around 5 a.m. and took out $500. When he returned home, Kathleen was lying in bed, sort of half asleep. He got into bed, and at some point, she got up and dressed and said she was going to go. She did not say she was going for a run, but she put on workout clothes. He heard her open the front door and leave the house.

¶ 77    Later that morning, defendant went out by the river to clear his head and be by himself, and he told the officers that he thought "you know, we've got to start making plans to get divorced. It's obviously where we're at." As in his first interview, he denied ever harming Kathleen. When asked about his fat lip again, he said it "went away." Defendant eventually asked for a lawyer, and the interrogation ended.

¶ 78    On Pech's cross-examination, he agreed that he had previously noted that the bruise on Kathleen's left arm could possibly have been the result of someone grabbing her and holding her down, but that viewing a photograph of a preexisting bruise in that spot would have affected his opinion. He agreed that he did not find vomit at the scene of Kathleen's body, and, despite Kathleen's phones having "smudges on it," he did not obtain any fingerprints from the phone.

¶ 79    Investigator Rusty Sullivan was a forensic consultant, and before that he worked for the City of Geneva Police Department as a civilian forensic investigator where he had specialized as an evidence technician. On July 8, 2014, Sullivan was activated as a member of the Kane County Major Crimes Task Force, to be briefed regarding Kathleen's suspicious death investigation. The

evening of that same day, he assisted in searching Kathleen's home at 817 Oak Street. During the search, he collected, among other things, two Amazon tablet devices and a "tower-type" computer. The computer's hard drive was subsequently removed from the tower for forensic digital testing.

¶ 80 An object of "curiosity interest" was an open bottle of Clorox bleach on the kitchen cabinet countertop. Sullivan also found some decaying "vegetative leaf-like material" near the washer and dryer. Within the washer was a "comforter-like object" that was wadded up and still damp or wet, with areas of vegetative material or similar substance on the surface of the object and the machine itself. In the bathroom, Sullivan noted that the interior frame of the bathroom door was missing the striker plate and that there was some damage to the region of the door frame itself near where the plate should be, as evidenced by fresh exposed wood.

¶ 81 Sullivan also testified to a forensic download of Kathleen's iPhone. The forensic download report was approximately 900 pages with thousands of entries. Between the time Kathleen began using the iPhone and the last message sent to Billy Keogh around 5 a.m. central time[3] on July 6, 2014, she had 3,499 text messages between her phone number and Billy's.

¶ 82 Sullivan testified specifically to 11 text messages sent from Kathleen's phone number to Billy's on July 6. The first was sent at 4:18 a.m., saying "What's up." Between 4:42 a.m. and 4:49 a.m., Kathleen's phone sent the following eight messages in order: "I'm fucking my husband right now," "Sorry," "3 orgasms fuck yes," "Sorry but I was horny," "Hey you still the one," "He's just good in bed," "But you the guy," "Hey talk to me." At 4:56 a.m., her phone sent "Sorry drunk," and at 4:57 a.m., it sent "Please forgive."

---

[3]All time references in this disposition are to central standard time, unless otherwise noted.

¶ 83    Sullivan also identified a short, approximately 3-second video from Kathleen's phone from 5:19 a.m. on July 6. The video appears to have been taken from the driver's seat of a vehicle, perhaps with the radio on.

¶ 84    Last, he reviewed some of Kathleen's Facebook activity. She became Facebook friends with Billy Keogh on June 4, 2014. She sent Billy a private message at 5:14 a.m. on July 6, 2014, that read "If you get odd phone calls—he took my phone."

¶ 85    Officer Sara Sullivan, who was a computer crimes specialist, testified that she reviewed various documents and records in Kathleen's death investigation. Of note, she reviewed a text message from defendant's phone to Kathleen's on June 22, 2014, around 7 p.m. (the day Kathleen went to the Cubs game with, among others, Billy Keogh) that said, "Damn Kate, what the hell." She also identified internet histories from defendant's home desktop computer on June 22, 2014, at 8:47 p.m. (while Kathleen was still out on the day of the Cubs game outing) and July 7, 2014 (the day after Kathleen died) around 11 a.m., showing visits to Billy's Facebook profile, including looking at his photos and friends tab.

¶ 86                            4. Defense Lay Witness Testimony

¶ 87    Defendant testified in his own defense as follows. He was 55 years old at the time of his bench trial. Around July 5, 2014, he estimated that he was 6 feet 4 inches tall and weighed 275 pounds. He had been married once before Kathleen, to a woman named Stacey Howard. He filed for divorce because "[s]he was seeing somebody else." Sometime after divorcing Stacey, he began dating Kathleen, and they dated about two years before marrying. They became engaged after Kathleen became pregnant.

¶ 88    Defendant testified that other men would pay attention to Kathleen, but it did not make him jealous, and prior to when she went into the Army reserves, he never felt that she had an emotional

interest in another man. When she went to her military training, he assumed the role of a full-time parent at home and took a leave of absence from his job at Ackerman, which was a company that did insurance claims.

¶ 89  While Kathleen was away at training, they had their tenth wedding anniversary on May 29, 2014, and at that point in time, he felt that their relationship was intact and healthy. After that date, however, things "changed a little bit," with fewer and shorter calls between them. Around this time, he saw that Kathleen had become Facebook friends with Billy Keogh.

¶ 90  When Kathleen returned home from training around June 14, 2014, she "was a little more standoffish, a little more reserved" than the woman he knew. She was also very guarded with her phone, and she was texting "hundreds of times a day." She was also drinking a lot more after returning home; whereas before she would call him to pick up a bottle of wine on his way home from work, now she had "three or four bottles of unopened wine" in the house at a time.

¶ 91  Defendant admitted to throwing Kathleen's phone into a pond on a visit to his father's home near Carrollton, Illinois. He explained that she was texting a lot, and their three kids were trying to get her attention. He grabbed her phone and told her she needed to pay attention to the boys. He walked off with the phone and, as he was near the pond, he thought to himself, "Man, this damn phone, you know," and threw it in the pond. She had "very little response," and he did not remember any swearing between them. A few days later they went to get new iPhones.

¶ 92  On June 19, 2014, they had "a few discussions about the texting, about if she was seeing someone else." They had had those discussions before. She said no, she was not seeing anybody else. She said Billy was just one of the friends she had met in the military.

¶ 93  Regarding the Cubs game on June 22, Kathleen told him that it was a "sisters' day." By that afternoon, he realized she was not going with her sister, and he saw via Facebook that Billy

was attending the Cubs game. He was "suspicious" but also "worried about her." Later that day, he texted her, "Damn Kate, what the hell," because she had lied about where she was and who she was with. He accessed their Chase bank account multiple times that evening to try to see where she might be. She did not come home until around 2 a.m.

¶ 94 Subsequently, defendant brought up the possibility of divorce with Kathleen both in conversation and writing. He was "worried about [his] marriage." After he presented his note concerning divorce to Kathleen, she said that she would not give him a divorce, that she would never sign the papers. The note, which was admitted as a defense exhibit, began "Monday— Divorce attorney get over with," listed ideas for child custody, and provided that Kathleen could move out of state. Defendant's note ended by saying that Kathleen was "going to do great things" and that he "will always consider [her] a friend" and wanted the best for her. They were still having "normal sexual relations" after the Cubs game.

¶ 95 Defendant confirmed that Kathleen was drinking at the Ravinia concert and at the bar after the concert. She did not feel well that night, becoming lightheaded and nauseous; she leaned on him while leaving the bar. Kathleen also drank wine at the barbecue on July 5, 2014. He knew she drank a bottle and opened a second, and he estimated that he had "five to eight" beers. Afterward, they went to the Dam Bar, where they saw Chad Lunsmann. Kathleen continued to drink wine, although he did not monitor her drinking. Defendant and Chad did shots, although he did not know of what. Kathleen also had one or two shots, and they ordered some nacho chips. She was "a little tipsy but happy," and her interaction with him was "great." They were "very happy," with kissing, hugging, and flirtatious behavior. They left the bar at 2 a.m., and they took Chad home.

¶ 96    Defendant continued that, when he and Kathleen got to their home, they sat on the couch and began talking. At first, they talked about the military and then about the future. They were not talking about divorce or Billy. They were happy, thinking that "the future was going to be good."

¶ 97    After a couple of hours, defendant went to brush his teeth in the bathroom, and Kathleen was in the bathroom on her phone. She put the phone on the sink, and he grabbed it. She did not say anything when he grabbed the phone; he thought maybe she was not sober enough to realize he took it. He walked out to the porch with the phone and scrolled through it. He saw "an unending crap load of messages" and it "hurt." There were thousands of messages; he knew "something was going on" and thought "this is obviously, you know, more than a friend."

¶ 98    At some point, defendant got in his car to go to the bank and take out money. He went to Chase Bank in Geneva, which took him 12 to 14 minutes to get to, and took $500 out of their joint account. He testified that the money was to fix his Dodge Durango, including to buy a new oxygen sensor. He explained that he needed a working car to go back to work, especially if he was getting a divorce.

¶ 99    Defendant admitted to sending 11 text messages to Billy from Kathleen's phone between about 4:18 a.m. and 4:57 a.m. He was pretending to be Kathleen and "just trying to sprinkle some crap in his Wheaties." He was not angry when he sent the messages; he was hurt. He agreed with the State that, given the timing of the texts, he was texting while driving to the bank.

¶ 100   Defendant returned home from the bank around 5:30 a.m. and found Kathleen lying in their bed. He told her that she needed to make a decision. She did not respond, but he knew she heard him. He fell asleep for maybe 45 minutes in the bed, and, at some point, Kathleen left the bed. He saw her getting dressed, which was not normal. She was putting on a T-shirt and shorts, and he heard her leave the house. His first thought was that she was going for a walk or run. He denied

that she wore contacts or glasses every day. On cross-examination, he was unaware that her driver's license listed a restriction to drive only with corrective lenses.

¶ 101   Defendant got out of bed maybe half an hour after Kathleen left, and he left the house at about 7:45 a.m. to get donuts from Jewel. He got gas and then drove by the river for 15 to 30 minutes, which was something he did frequently. At the Jewel, he used some wipes to clean his hands and then bought donuts before returning home around 9 a.m. He texted Kathleen to try to get Kurt's phone number, and he believed he also texted Kristine for the number as well. He was not concerned that she was not back at the house when he returned. Defendant left the house again, this time to pick up their children from Kathleen's father's house in Elk Grove.

¶ 102   When defendant first arrived at Kurt's home, nobody was there, so he went to Kurt's mother's house before returning to Kurt's around 11:30 a.m. He walked up to the front door and knocked. Kurt told him to hold on a second, and when he returned to the door, he asked defendant, "What did you do?" Defendant responded that he did not do anything, but he did not know what Kurt was talking about. Kurt then said that Kathleen was dead. Defendant thought this must be a mistake—he was in disbelief.

¶ 103   Defendant testified that Kurt closed and locked the door, and he returned to his car and tried to call Kathleen. She did not answer, and he left a voicemail. He denied having told Kurt that he and Kathleen had had a fight or that she went running at 6:30 a.m. Police then arrived at Kurt's residence, and a male officer informed him that his wife was deceased. Defendant returned to the Geneva Police Department with the officers, where he thought that he was going to help them figure out what happened to his wife.

¶ 104   In reviewing photographs of his house, defendant explained that the damage to the bathroom door frame was caused by his boys. He also explained Kathleen's bruise on her left

biceps as caused by the boys playing "roughhouse" with her. He denied that his lip was swollen when interviewed by the police on July 6, 2014. He denied ever injuring or harming Kathleen.

¶ 105   On cross-examination, defendant testified that he never asked Pech or Jerdee how Kathleen died. He believed he was probably drunk or "tipsy" around 4 a.m. on July 6 and hungover at the interview with Pech and Jerdee. He also testified that he accidentally deleted the internet history off one of the recovered Kindle devices.

¶ 106   Raelene Thielk testified that she lived around the corner from defendant, on Briar Lane. She knew defendant's three boys because Brandon was friends with her son; they rode to school on the same bus. She had talked to defendant and seen him around the neighborhood. On July 6, 2014, she got up at 5:57 a.m. and took her dogs for a walk about five minutes later, returning home between 6:20 and 6:25 a.m. Her walk took her near the railroad tracks. She did not see defendant's car nor another person while she was on her walk.

¶ 107   Terry Rieser testified that on July 6, 2014, she was living in a duplex at 319 Sandholm Street in Geneva, which was right by Esping Park, with the Metra train tracks directly across the street. That day, she got up a little before 5 a.m. and took her dog for a walk. She was unable to see the train tracks on her walk because of a fence. Her walk was quick, and she returned around 5 a.m. Her brother had been staying with her, and he got up at 6 a.m. and began packing to leave. He had his dog with him, and she walked his dog shortly after he got up while he packed. The walk was only five to seven minutes long. Between 6:10 and 6:30 a.m., she and her brother were in and out of her house carrying his stuff out and continuing to get him packed. At no point in time that morning did she see a blue Dodge Durango or defendant. She saw nothing unusual that morning.

¶ 108                                    5. Expert Testimony

¶ 109    Critical to the resolution of this case were the expert opinions related to Kathleen's cause of death. The State and the defense offered competing expert medical opinion testimony regarding how Kathleen died, and the defense offered additional expert testimony with respect to an analysis of matter found on Kathleen's shoes and the location of her iPhone at various times on the morning of July 6, 2014. The experts were as follows: Mitra Kalelkar and William Smock for the State, and Larry Blum, Arvindh Kanagasundram, Leon Gussow, Yaniv Schiff, and Skip Palenik for the defense. We review the pertinent expert testimony as follows.

¶ 110    Dr. Mitra Kalelkar is a forensic pathologist, and she testified for the State as an expert in forensic pathology. As a forensic pathologist, she performed autopsies to determine the cause and manner of deaths. She had performed more than 5,000 autopsies. She had testified as an expert witness more than 500 times, testifying for the State and the defense.

¶ 111    Kalelkar performed a toxicology screen on Kathleen. The screen revealed the presence of alcohol and "a little bit" of caffeine in her system. She did not believe anything within Kathleen's toxicology results contributed to her death.

¶ 112    Kalelkar performed Kathleen's autopsy on July 7, 2014, at the Du Page County morgue. Kathleen was 5 feet 10 inches tall and weighed 149 pounds.[4] At the outset, she explained that lividity is a postmortem[5] phenomenon: it is the settling of blood caused by gravity after the circulation of the blood stops. Lividity is visible within an hour or two after death, and it becomes fixed about six to eight hours after death. She identified lividity in both of Kathleen's legs, based on the State's photograph of Kathleen from 7:32 a.m. on July 6, 2014. In her opinion, a person

---

[4]Kathleen's driver's license from October 2012 listed her as 5 feet 8 inches tall and 140 pounds.

[5]As Kalelkar explained, postmortem means "after death," antemortem means "before death," and perimortem means "right around the time of death."

with lividity at that time would not have been alive at 7:14 a.m. She later differentiated lividity from cyanosis, which is a blueish discoloration as the result of hypoxia.

¶ 113   Her autopsy began with an external examination of the body and moved to an internal examination. The external examination included noting the natural characteristics of the body, the clothing, and any evidence of injuries. Kalelkar found no evidence of sexual assault or pregnancy, and her X-rays revealed no evidence of skeletal injuries to her body.

¶ 114   The clothes that Kalelkar removed were a gray T-shirt, black shorts, black and pink shoes, and pink socks. Kathleen was not wearing contacts. The shorts were loose, and the tie on the shorts was not knotted. Kalelkar did not find any urine or feces when removing the shorts, nor any on the rest of the body.

¶ 115   The State showed Kalelkar a photograph of the bottom of Kathleen's shoes, and she described them as "fairly clean" with a little bit of dry dirt on them. Kathleen's right sock was worn differently than the left: the heel of the sock was on the front in that it was up near the ankle.

¶ 116   Kathleen's bra was "very peculiarly placed *** in that *** the left cup of the bra [was] just below the nipple, but the right side, [was] just above the right nipple." Also, the bra was twisted on the left side, which was "very unusual." The fit of the bra did not assist her much in reaching her conclusion on Kathleen's cause of death, but it did impact her finding as to the manner of death.

¶ 117   Viewing a photograph of Kathleen's face, Kalelkar noted two contusions, *i.e.*, bruises, under her chin. In her opinion, both of the bruises occurred antemortem, citing the presence of hemorrhage. She testified that the bruises were not consistent with Kathleen falling onto the railroad track. Kalelkar continued that had Kathleen fallen onto the track in the position she was discovered lying, she would have had bruising to the front of the chin and "her lips would have

been involved." It was possible that the bruises were caused by an assailant or Kathleen's own hands trying to remove an assailant from her throat.

¶ 118  Kalelkar was next directed to a photograph of Kathleen showing a red line on her neck. She identified the red line as a "3-inch-long erythema," with erythema meaning simply "reddening of the skin." The injury was either antemortem or perimortem, and it indicated "some sort of injury to her neck." The erythema was not consistent with Kathleen falling and striking the railroad track. The injury was possibly consistent with being strangled—she stated that a soft ligature could leave a mark like the one depicted in the photograph.

¶ 119  Turning to Kathleen's upper left arm, Kalelkar noted diffuse bruising and described it as a perimortem injury. She opined that the bruising on the outer half of the arm was consistent with someone grabbing Kathleen's arm with a hand to pull her body immediately before or at the time of her death, but it also could be consistent with Kathleen falling onto the railroad track. Regarding the bruising on the inner part of the arm, she opined that it was consistent with a person grabbing her left arm with a hand during an assault, but, unlike the bruising on the outside of the left arm, it was inconsistent with falling on the railroad track.

¶ 120  Kalelkar next viewed pictures of Kathleen's legs. She identified postmortem pressure impressions on the legs from the surface that Kathleen had been lying on. Kathleen had injuries to the left ankle, laterally and on the front; the lateral injury appeared to be antemortem due to the presence of hemorrhage. Kathleen's left knee had a "tiny abrasion with hemorrhage," which was not consistent with her falling by the tracks; she "would expect a lot more injuries to the knee because of the amount of gravel and stones" near the tracks. An injury to Kathleen's lower left leg immediately above the tongue of her left shoe was likely a postmortem injury and was not consistent with falling on the tracks. The right ankle also appeared to have postmortem injuries in

the form of "a few scrapes or abrasions on the medial aspect" of the ankle. The right ankle injuries were consistent with being on the rocks near the tracks but were not consistent with being alive at the time they occurred; Kalelkar would have expected more contusions and hemorrhages had she been alive at the time of injury.

¶ 121    Kalelkar next reviewed photographs of Kathleen's eyes. Her left eye showed "numerous petechial hemorrhages in the conjunctiva." Petechial hemorrhages are "pinpoint hemorrhages" that occur when an engorged capillary bursts. The right eye showed petechial hemorrhages in both the lower eyelid and the conjunctiva.

¶ 122    Kalelkar explained that, when a person is strangled, "the venous return to the heart is obstructed or impeded and that causes engorgement of the capillaries which will burst." Kathleen's petechial hemorrhages were consistent with strangulation or compression of the neck and/or chest, although they were also consistent with other causes, such as projectile vomiting and serious coughing. The hemorrhages in her eyes were not consistent with Kathleen falling on the railroad track, nor were they consistent with any medical condition that Kalelkar was aware of Kathleen having.

¶ 123    Based on the position Kathleen was found, Kalelkar would have expected several more injuries had Kathleen fallen into that position: chipped teeth, lip damage, and injuries to the palm of her hands, but Kathleen did not have damage to her teeth, lips, or palms.

¶ 124    The State next asked Kalelkar about her internal examination of Kathleen. Aside from the throat and tongue area, she did not find any injuries to Kathleen's organs. Kalelkar removed the tongue, and her subsequent examination of it revealed "two areas of hemorrhage which are focal" and not diffuse at the base of the tongue, which appeared in the State's photographic exhibit as

two dark spots. The focal hemorrhages were not consistent with Kathleen falling onto the railroad track. They were, however, consistent with someone strangling her to death.

¶ 125   Kalelkar next reviewed her examination of Kathleen's throat, and she testified that there were petechial hemorrhages in the epiglottic mucosa and laryngeal mucosa. These hemorrhages were not consistent with Kathleen falling onto the railroad track, but they were consistent with someone choking Kathleen to death.

¶ 126   The various petechial hemorrhaging indicated to Kalelkar that Kathleen was strangled. Kathleen's position on the tracks was not consistent with positional asphyxia, which occurs when the body is in a position that prevents breathing. Based on her training and experience and to a reasonable degree of medical certainty, Kalelkar opined that Kathleen died of asphyxia caused by neck compression. It was also her opinion that Kathleen did not die as a result of a fall or landing on the railroad track. Her opinion was based on her autopsy findings as well as the investigative reports.

¶ 127   On cross-examination, she agreed that Kathleen's blood alcohol concentration (BAC) was .15 at the time of postmortem testing and that her BAC may have affected her behavior, such as whether or not she put on underwear, although she disagreed that it caused her to wear her bra as twisted as it was. She agreed that Kathleen's BAC may have been higher prior to her death.

¶ 128   Kalelkar disagreed that Kathleen likely bumped her chin on the rail to produce the bruises under her chin; it was "highly unlikely" because when somebody bumps their head on a hard surface, the prominent parts of the face—like the nose, chin, forehead, or zygomatic processes— would be impacted, not the "recessed part of the body."

¶ 129   When asked by defense counsel about the erythema on Kathleen's neck and its cause, Kalelkar testified that she did not know what instrument was used to strangle Kathleen. It was

possible for the perpetrator to have used a soft ligature, but she was not saying one was used. She admitted that she did not find a hyoid bone fracture, damage to the thyroid cartilage, or intramuscular bleeding, although she explained that a hyoid bone fracture and cartilage damage occurred in only 30% of manual strangulation cases.

¶ 130   Given the circumstances of this case, Kalelkar believed that the petechial hemorrhages were a "very specific finding," but she agreed with defense counsel that they could occur if a person sneezed very hard, although it would not result in as many petechiae. The "significant amount" of petechial hemorrhages in this case "would make any forensic pathologist suspicious."

¶ 131   Kalelkar agreed with defense counsel that there were many different causes of asphyxiation. She explained that the reason she did not immediately specify the cause of Kathleen's asphyxiation during her investigation was that she could not initially "separate the two" possibilities of chest and neck compression. She agreed that Kathleen did not have pulmonary edema, but she disagreed that pulmonary edema was a necessary finding for asphyxia; it could occur, but it was a "non-specific finding."

¶ 132   The State's other expert witness was Dr. William Smock, who was accepted as an expert in forensic and emergency medicine as it related to asphyxial causes of death, particularly strangulation and positional asphyxia and their causes, and pulseless electrical activity (PEA). He testified as follows.

¶ 133   He first explained that asphyxia was an umbrella term for when the human body has been deprived of oxygen. Strangulation was a form of asphyxia, defined as the "application of external pressure to the neck, blocking airflow, blood flow[,] or both," whereas positional asphyxia is "when there is an application of external pressure to a human body that restricts the ability to breathe," which can be pressure on the neck, back, chest, or abdomen that compromises the body's

ability to expand, bring air into the lungs, and expel cardon dioxide. Manual strangulation, which was the most common form, meant strangulation by use of hands or arms, and ligature strangulation meant the use of a cord or some other object pulled against the neck. Smock continued that suffocation, which could also result in asphyxia, was the application of pressure to the nose or mouth, inhibiting the ability to breathe. Suffocation and strangulation were not exclusive; both could occur at the same time. He also defined PEA as when a person has no pulse but there is electrical activity within the heart.

¶ 134   Based on Smock's review of this case, he opined that Kathleen was "assaulted, strangled[,] and suffocated." As confirmed on cross-examination, he believed that Kathleen was grabbed by her left arm and then manually strangled at some place other than the train tracks. In forming his opinion, Smock relied on his 38 years of experience and his review of police materials, including photographs from the scene of Kathleen's body, Kalelkar's autopsy notes and report, and testimony from the first trial, among other things. In support of his opinion, he noted injuries to Kathleen's neck, venous congestion (a backup of venous blood), petechial hemorrhages in both eyes and her throat, marks on her left arm consistent with a grab mark, and evidence of imprints of her teeth on the inside of her lower lip consistent with strangulation. In his opinion, none of those injuries were consistent with Kathleen falling or collapsing at the railroad track. Further, he did not believe that positional asphyxia played any role in Kathleen's death.

¶ 135   Smock explained the effects of stopping blood flow to the brain via compression of the arteries. When blood flow is blocked to the brain, a person would lose consciousness in 6.8 seconds on average, with a range of 4 to 10 seconds, and they will stop breathing between 1 and 2½ minutes. It would take about 11 pounds of pressure, or about double the force to pull a trigger on most

firearms, to occlude the carotid arteries. Smock described this as "minimal pressure." It would take about three times more pressure, however, to collapse the airway.

¶ 136   Smock continued that, if only the airway is blocked and not the blood flow, loss of consciousness would occur "somewhere after a minute or so," with the best example being drowning. Thus, death from restriction of blood flow is faster. Every second without oxygen after losing consciousness, millions of synapses in the brain will die, and as brain cells die, a person will stop breathing because the part of the brain controlling breathing will die. Furthermore, after losing consciousness, the person will experience an anoxic seizure, where the person may lose control of the bowel or bladder, resulting in defecation or urination. Defecation or urination could occur with other causes of death. Smock explained the absence of evidence of urination in this case, citing that Kathleen had only four cubic centimeters of urine in her bladder, indicating that either the strangulation occurred at another location or that she had emptied her bladder prior to being strangled.

¶ 137   Smock next testified generally about cyanosis, explaining that it could be a sign of asphyxia, and it is caused by lower levels of oxygen in the blood. It can be present in persons both living and dead. Lividity, on the other hand, was a postmortem phenomenon. The earliest he had observed lividity in a person was within 30 minutes of the heart stopping. He described the formation of lividity as a "gradual process," where the longer the blood sits, the more blood will pool in lower parts of the body.

¶ 138   Relying on the Metra employees' testimonies of their observation of Kathleen's body on the morning of July 6, 2014, especially Mongelli's observation at 6:47 a.m., he believed Kathleen was "clearly deceased" when found because her oxygen levels were low enough to cause cyanosis and she displayed lividity. He had never seen a person with lividity be resuscitated.

¶ 139   Turning to his opinion that Kathleen was manually strangled and suffocated, Smock cited evidence of trauma to her neck, trauma to her extremities, and both external and internal petechial hemorrhaging. As in Kalelkar's examination, he found petechial hemorrhages in Kathleen's eyes. He opined that petechial hemorrhages were a "pressure phenomenon" and were evidence of manual strangulation, explaining that they were the result of pressure buildup within the capillaries because the blood pumped up could not get back to the heart due to pressure on the jugular vein in the neck. He acknowledged that petechial hemorrhages had other causes, such as childbirth, forceful vomiting, or scuba diving—anything that could sufficiently increase pressure within the capillary bed. However, he did not believe any alternative explanation existed in this case that would explain Kathleen's petechial hemorrhaging.

¶ 140   He also found petechial hemorrhages in the voice box and on the epiglottis itself. On the tongue, there were two areas of hemorrhage, but not petechial; the hemorrhages were evidence of trauma to the tongue itself, caused by "[s]ome pressure, blow, something to the base of the tongue causing the blood vessels in the muscle to rupture." The position of the tongue hemorrhages aligned with the area right underneath the jaw, between the chin and neck. Smock believed that the hemorrhages indicated pressure to the neck area of the base of the tongue. Furthermore, he testified that the tongue hemorrhages did not occur during autopsy; the bleeding into the tissue ruled out a postmortem cause.

¶ 141   Smock further noted evidence of venous congestion in Kathleen, which was "pressure that builds up within the veins." Smock explained that venous congestion presents as a reddish tint to the face, and he found that photographs of Kathleen showed venous congestion: he identified congestion on her right cheek and on the right lateral neck behind the ear. He also noted areas of white surrounded by venous congestion, which showed where the pressure was applied, including

the area of the neck over the voice box. He focused on venous congestion on the right half of her body because she also had lividity causing discoloration on the left side. In his opinion, the presence of venous congestion on Kathleen's face was consistent with asphyxial death by strangulation.

¶ 142   Smock clarified that both Kathleen's petechial hemorrhaging and venous congestion occurred before or at the time of death. He explained that this was because the heart had to still be pumping blood to the head for these injuries to manifest; in other words, she had to be alive to sustain these injuries.

¶ 143   Regarding suffocation, Smock noted an imprint pattern of Kathleen's teeth on her lower lip, which occurs when pressure is applied from the outside while the heart is still beating. He also found a "superficial laceration" of the tongue, indicating some sort of trauma, consistent with pressure against teeth with a gap where the teeth came together. Smock opined that these injuries were not consistent with Kathleen's lower face making contact with the railroad track.

¶ 144   Smock identified other injuries to Kathleen's neck, specifically two bruises under her chin. He opined that these were the result of "blunt force trauma." The right-side bruise was "blanched white," indicating the application of external pressure. The bruises were consistent with the hemorrhages found underneath Kathleen's tongue but not consistent with her contact with the railroad track: the track was linear, but the bruises were circular.

¶ 145   Smock continued that injuries to Kathleen's upper left arm were consistent with an assault. He described four linear pattern imprints on the inner aspect of the arm, and bruising on the outer aspect of the arm. The injuries were consistent with "the type of pattern that you see when you are grabbed by a hand," with the injuries to the inner aspect showing where the fingers grabbed her and the injury to the outer aspect showing where the thumb pressed. He had seen this pattern

"hundreds of times in victims of assault where, whether it's a male or a female, someone is grabbed hard enough with a hand to create bruising under the skin from pressure from the thumb and four fingers." The injuries to the arm occurred when the heart was still beating.

¶ 146 Turning to Kathleen's intact hyoid bone, Smock explained that hyoid bones do not fuse until the third decade of life, and Kathleen was only 32 when she died, so it may not have been fused. Even then, a hyoid bone fracture was seen in only "[s]omewhere between 10 and 20 percent" of strangulation cases; it depended on how much pressure was applied to the throat and neck, with higher pressure needed to cause a fracture. The absence of a hyoid bone fracture did not impact his opinion on the cause of death in this case.

¶ 147 Last, Smock addressed Kathleen's PEA. Her PEA, as indicated by her electrocardiogram (EKG) strip from 7:14 a.m. on July 6, 2014, did not indicate that she was alive at that time. There was "no way [Kathleen] could have been resuscitated because she had been dead for a long period of time as evidenced by the lividity that was seen at 6:47." He was aware of an article purporting to show that PEA could be observed in a body only within 12 to 21 minutes of the precipitating event. However, not only had Kathleen been at the scene longer than that by the time of her EKG, but also the article was based on a study of only three patients taken off ventilators to monitor their hearts, and its author acknowledged to Smock that the range reported was only how long PEA lasted in those three patients and that PEA may last much longer in others.

¶ 148 On cross-examination, Smock answered that although pulmonary edema is "certainly common" in asphyxial deaths, he had seen manual strangulation cases where pulmonary edema was absent: it was "not 100 percent in manual strangulation." The same went for pulmonary congestion.

¶ 149 The defense offered several expert witnesses on various subject matters.

¶ 150   Dr. Larry Blum was a medical doctor who testified for the defense as an expert in forensic pathology. He had performed over 12,000 autopsies in his career and had testified as an expert in forensic pathology over 650 times, usually for the State in criminal cases. In preparing his opinions in this case, he had reviewed various materials, including police reports, the autopsy report, the toxicology report, and photographs of Kathleen's body on the railroad track and from her autopsy.

¶ 151   Regarding Kathleen's time of death, Blum opined that she did not die an hour or so prior to 7:25 a.m. but instead it was "a very recent time of death." When questioned by the trial court for clarification later, Blum put the time of death at sometime after 6:25 a.m., explaining that she could have died right around when she was found and that he was "not sure she was dead when the train went by her[.]"

¶ 152   Blum continued that, on July 6, 2014, the temperature between 6 and 8 a.m. was approximately 66 degrees Fahrenheit. Citing witnesses at the scene that described her body as "warm" at 7:07 a.m. and again at 8:10 a.m., he believed this supported a "very short post-mortem interval," meaning that, even going by her being warm at 7:07 a.m., it was very unlikely that death occurred prior to 6:07 a.m.

¶ 153   Based on Kathleen's pictures from the scene, including of her head after she had been rolled over, he did not find evidence of rigor because the neck was extending backwards. He could not make any judgments on the presence of rigor based on the photographs of her legs. The photographs of her legs showed "a very early lividity." He also identified early lividity on her arms. He explained that lividity could manifest as early as 20 minutes after the cardiovascular system collapses, but it took hours to fully develop. He opined that her display of lividity matched her location exactly, that is, it was exactly what he would expect to see if the lividity formed while she was on the railroad track.

¶ 154    Blum's testimony turned next to Kathleen's injuries. He identified two areas of injury under Kathleen's chin as antemortem injuries. He opined that the more central of the two injuries was caused by her chin coming into contact with the rail, citing in support the presence of rusty brown material near the injury. One of the chin injuries extended in a linear fashion, with the pattern matching the pattern of the railroad track itself. Although the photograph did not show that area below her chin in contact with the rail, he believed that "at some point her head was in a different position. And we know that—just common sense."  He did not believe the injuries were caused by thumbs, as thumbs tend to make larger wounds than those Kathleen displayed.

¶ 155    Blum next identified erythema on Kathleen's neck. He opined that the erythema was caused by the position of her neck on the rail. He did not believe it was caused by a soft ligature, because a ligature would "cause pallor" in that it would force blood out of the area and become pale, not red.

¶ 156    Kathleen's lips also displayed injury. In his opinion, the "small red streak like areas on the inner portion of the lower lip were caused by contact with the worn rail at the scene." He did not believe the lip injury was consistent with Kathleen being strangled, although he conceded that "you can get similar injuries" in homicidal suffocation cases. He explained that in suffocation cases, the lips generally are pushed back against the teeth, and more widespread injury is observed, meaning injury to the entire upper and lower lips.

¶ 157    Blum identified an injury to Kathleen's hip: a one-inch abrasion to her left hip, high up on the lateral thigh. At the scene, Kathleen's hip was in contact with the wooden railroad tie and the ballast rocks adjacent to the tie. He opined that the injury was caused when she collapsed at the rail and her hip contacted the tie and/or a ballast rock.

¶ 158   Regarding the lateral bruising to Kathleen's left arm, Blum classified it as an antemortem injury. He believed the injury "could be produced by someone grabbing and pressing the thumb on this area of the body," but there was also evidence that the injury to the outer arm was caused by contact with the rail, and the bruising was linear like the rail. Blum opined that, without the photograph showing her arm against the rail where the bruising was, it was "50/50" whether the cause was the rail or a grab, but with the photograph, it was 99% caused by the rail. As to the bruising on the inside of her left bicep, he believed that was antemortem, and he identified a bruise—albeit with a different shape, described as "kind of a square"—in the same general area of her arm from a photograph of Kathleen taken about two days before her death.

¶ 159   He further observed deposits of rust on Kathleen's right forearm consistent with resting near a rusty plate, and dark material or debris on her right palm and debris on her right thumb consistent with her placing her phone inside the track.

¶ 160   He next opined that a small cut to Kathleen's left knee was antemortem. He noted some dirt patterns on Kathleen's knees, which he believed were consistent with Kathleen bending her knees and contacting the ground. The position of her right shoe indicated to him that she had a collapse at the track "then a change in motion and the foot going back somewhat to produce its final position." He testified that Kathleen "was down on all fours when she had her major medical crisis and collapsed to the left like the injuries show."

¶ 161   Blum identified a food particle on the rail at the scene, which he believed was from a chip from the Dam Bar. He opined that Kathleen regurgitated, not vomited, the chip, and spit out the particle at the track. He later confirmed that a person who is brain dead cannot vomit.

¶ 162   Blum did not believe that Kathleen displayed cyanosis, although he agreed that cyanosis could be present with an arrhythmia. He further did not find that she had pulmonary congestion

consistent with asphyxia, which he would expect to find in "probably over 99 percent" of asphyxial deaths.

¶ 163   In reviewing the examination of Kathleen's tongue, Blum identified two small areas of blood on the underside of the tongue. He believed these were caused by the removal of the neck contents during autopsy.

¶ 164   Based on his review of the case, Blum opined that Kathleen was not placed at the scene. He believed that her place of death was at the railroad track following a collapse down into an all-fours position. He did not find that Kathleen's twisted bra had any significance, citing her BAC.

¶ 165   As to the cause of her death, he opined that she died of a sudden arrhythmic death. He did not believe that Kathleen had any medical signs specific to strangulation or asphyxial death. Regarding strangulation, he noted the lack of the following findings: no bulging eyes, no scleral hemorrhage in the eyes, and no neck fingertip bruising, among other findings. Regarding asphyxia, he noted the lack of pulmonary vascular congestion and edema, the lack of cerebral edema, and the lack of visceral congestion throughout the body.

¶ 166   On cross-examination, Blum admitted that, at the first trial, he testified that Kathleen had no injury to her hip. He also admitted that at the first trial, he testified that the injuries to Kathleen's outer left arm were "a bit curved," whereas at the new trial he described them as linear. He agreed that the injuries to the inside of the arm could be imprints of fingers. Taken together, the arm injuries were consistent with a grab in appearance. He further answered that laryngeal petechia had "no diagnostic value whatsoever," and were not a sign of strangulation, although he admitted that they could be present in a strangulation death. Later, on redirect examination, he testified that there was "no association between asphyxia and petechial hemorrhages anywhere, facial, eye, or

internal petechiae." Finally, he agreed that he would not have expected Kathleen's hyoid bone to be fractured absent "excessive force like someone in a mad rage attacked her."

¶ 167   Dr. Arvindh Kanagasundram, a cardiologist and cardiac electrophysiologist, testified for the defense as an expert in the areas of cardiac arrhythmia leading to sudden death and interpretation of EKG strips. In preparing for his testimony, he had reviewed materials including Kathleen's EKG from the railroad track, documentation about Kathleen's prior use of alcohol, autopsy photographs, Kalelkar's testimony from the first trial, and Kathleen's toxicology report.

¶ 168   Kanagasundram analogized heart function to a combination of a pump and an electrical wiring system: a working heart requires "every electrical impulse to be associated with a synchronized contraction of the [heart] muscle." He explained that a variety of conditions can impair the contracting function of the heart, including "metabolic derangements." This included disorders in processing and regulating electrolytes, specifically potassium and magnesium, which, if poorly regulated or imbalanced, can predispose a person to a sudden cardiac arrhythmia. As an example, he cited viral infections that induce vomiting and diarrhea and can "waste a lot of potassium and magnesium." Another "really well known" example was alcohol use.

¶ 169   Kanagasundram continued that persons with metabolic derangement often have normal looking hearts that pump blood well. Yet, those same persons can have an underlying predisposition, "especially in the case of binge drinking," for a significant enough change in their electrolyte balance through a reduction in their levels of potassium and magnesium that they can "go into sudden cardiac arrhythmia without warning." In such situations, although the heart's "pump is strong," it does not receive the signal it needs to contract effectively, leading to cardiac arrest. He explained that such alcohol-related electrolyte imbalance is not age dependent, and it often presents in young students after acute alcohol use.

¶ 170   Kanagasundram explained that binge drinking was "way worse for predisposition to cardiac arrhythmia" in persons who are not used to consuming alcohol regularly. Their bodies are simply not conditioned to properly regulate electrolyte balance at that level of alcohol intake. For a woman, he defined binge drinking narrowly as "three to four drinks in the background of not drinking regularly," which would predispose the woman to an arrhythmia. People with arrhythmia may feel dizzy or lightheaded before a bad episode and may feel shortness of breath or nausea.

¶ 171   Kanagasundram had reviewed video from the Dam Bar, and he observed Kathleen "drinking a fair bit," including a mixed variety of alcohol. His understanding was that Kathleen did not drink regularly or drink large amounts. He cited Kristine's report that Kathleen might have passed out at a prior event after drinking. This was a "very concerning piece of history," and, along with her drinking the night before her death, these were the only two times he knew that Kathleen had excessively consumed alcohol. He was not aware of defendant's testimony at trial that Kathleen had kept bottles of wine around the house and was drinking more since returning from military training.

¶ 172   It was Kanagasundram's opinion that Kathleen's binge drinking the night of her death led to electrolyte disturbances and cardiac arrest.

¶ 173   Kanagasundram turned next to Kathleen's EKG and PEA. Her EKG from July 6, 2014, indicated cardiac electrical activity; it showed a "slow rhythm," which, combined with her unresponsiveness, made him think of PEA or maybe just a "very, very thready pulse." He had seen people with this sort of EKG be resuscitated, and it was his opinion that Kathleen could have been resuscitated when found on the railroad track.

¶ 174   On cross-examination, Kanagasundram agreed that he could not rule out strangulation as a cause of Kathleen's arrhythmia and that asphyxia was a cause of PEA.

¶ 175 Dr. Leon Gussow was a physician who testified for the defense as an expert in medical toxicology, including the effects of alcohol consumption. He testified that Kathleen's BAC from her cardiac blood was .15 grams per deciliter, and the BAC from the vitreous humor in the eye was .191 grams per deciliter. He characterized these levels of alcohol concentration as "severe intoxication." Based on the materials in the case, he also performed an extrapolation from Kathleen's .15 BAC, and he estimated that her peak BAC was at least .2 grams per deciliter. He believed it was possible that Kathleen's clothing, from her loose shorts to the twisted bra, could be explained by her intoxication level.

¶ 176 Yaniv Schiff was accepted by the court as an expert in digital forensic examination, and he was asked by the defense to extract data from Kathleen's cell phone and analyze the data harvested. He performed a forensic extraction of her phone in March 2021, and at the time he had software capabilities unavailable to the Geneva Police Department when they first analyzed the phone in or around 2014. In particular, Schiff recovered location history information. One location of Kathleen's cell phone was 300 South Glengarry Drive[6] in Geneva, from 6:34 a.m. on July 6, 2014. The margin of error in this location data point was 165 meters. A second location data point was from 809 Oak Street in Geneva at 6:23 a.m., with a margin of error of 65 meters. The location data points did not show who had possession of the phone or how the phone moved from one location to another.

¶ 177 The defense's final expert was Skip Palenik, and he was accepted by the trial court as an expert in forensic analytical microscopy. He had been retained by the defense to examine Kathleen's running shoes. The purpose of his examination was to determine, if possible, whether

---

[6]300 South Glengarry Drive is immediately east of Esping Park and north of the Metra train tracks.

Kathleen had been walking in her running shoes along the railroad tracks, on the ballast rocks or on the rails themselves. He ultimately opined that the particles and damage found on the bottom of her shoes were "exactly the things one would expect to find" if one were to walk on the ballast rocks near the train tracks.

¶ 178   In his review of Kathleen's left running shoe, he noted a "smudge of material" near the front of the outer side of the shoe, from which he took a sample. The sample contained particles that were primarily orange and red, and he concluded that they were hydrated iron oxide, *i.e.*, rust. He opined that the rust got on the shoe by "rubbing the side of the shoe against something that was rusty."

¶ 179   On the bottom of her left shoe, he observed "grayish dirt," but noted that it was only on the high points of the shoe; there was "nothing in the grooves" of the shoe. He observed abraded rubber on the shoe, which he explained had to be caused by moving against something harder than grass but was not caused by moving against concrete. He also found minerals and "particles of ferromagnetic metal" on the bottom of the shoe. On the bottom of the right shoe, he found tourmaline, "like the gem but" as a microscopic amount of the material, and he also found quartz grains. He believed the minerals came from the ballast rocks by the track and that some of the metal particles he found on her shoes were particles that had been created by a train with steel wheels rolling over a steel rail. Such particles could "[e]asily" cling to her shoes due to the "soft sticky rubber" available to secure them; when asked if pressure was necessary, he answered that "pressure would maybe help."

¶ 180   On cross-examination, Palenik agreed that the material he found on Kathleen's shoes could have been deposited days before her death, and then the shoes could have sat unused at home until somebody put them on her dead body and carried her to the railroad tracks. When asked if

Kathleen's body was held up and set down on the tracks, could that account for the necessary contact with the ballast rocks to deposit the discovered materials, he conceded that it could if her feet in fact faced down and enough force was applied. He further admitted that the scuff mark on the left shoe could have been pre-existing.

¶ 181                                6. Closing Arguments

¶ 182   In closing, the State argued that an expert was not needed for the trier of fact to find that the crime scene was staged, citing the supreme court's opinion on defendant's first trial. The State continued that nobody from the State had actually said the crime scene was staged. Defense counsel argued that "common sense would tell you this wasn't staged."

¶ 183                                7. Guilty Finding

¶ 184   The trial court issued its written decision on August 9, 2022. It found that Kathleen died of asphyxiation due to pressure applied to her throat and mouth; that her body was dressed by someone else and placed on the railroad track to suggest an accidental death and destroy evidence; that defendant was the only person who would benefit from staging the body in this way; that defendant had the motive, means, and opportunity to kill Kathleen; and that he was the only person with access to Kathleen at the crucial time. It ultimately found that the State had proved all elements of first-degree murder beyond a reasonable doubt and found defendant guilty as charged.

¶ 185   The trial court commented on the expert testimonies in relevant part as follows. It explained that Kanagasundram did not connect his opinion to Kathleen's physical injuries and that his opinion was inconsistent with her physical injuries. Gussow's testimony was "of little materiality," because Kathleen's BAC was "never disputed," and was listed at .15 at the time of autopsy. Further, it found Blum's testimony "not credible and biased," citing changes and inconsistencies in his testimony from the first trial as documented through both direct and cross-examination,

impeachment through inconsistent statements, and the fact that his opinions "did not credibly explain significant injuries" to Kathleen. The court also found problematic the practice of the defense preparing the report for Blum to sign.

¶ 186   In contrast to the defense experts, the trial court specifically found Smock's and Kalelkar's testimonies credible, which, along with the other evidentiary support, explained Kathleen's injuries. The trial court cited "two clear injuries" under Kathleen's chin, bruising on the arm consistent with a forcible grab from behind, and injuries to the tongue and lips.

¶ 187   The trial court specifically found that the defense's theory—that Kathleen's death was a sudden cardiac death brought on by binge drinking—not credible and contrary to her physical injuries. It found defendant's testimony incredible.

¶ 188   Regarding defendant's motive and opportunity, the court found both were present in this case. The evidence supported a motive in that it showed that defendant was "angry, suspicious[,] and believed his marriage was disintegrating," and that he had a plan for a divorce. The evidence also supported opportunity, as the window of time for the homicide was between 5:14 a.m. (when Kathleen messaged Billy that defendant was using her phone) and 6:38 a.m. when her body was first observed on the railroad track. By defendant's own testimony, he was at home during the time when Kathleen's death would have occurred.

¶ 189   The trial court also commented on "staging." It wrote that the defense argued that Kathleen's body was on the track as a result of her falling after suffering a sudden cardiac death, but the trial court found that her body and phone were "staged" in that they were placed in the one spot where all evidence of manual strangulation would be destroyed, demonstrating a purposeful placement to the benefit of defendant.

¶ 190   The trial court sentenced defendant to 30 years' imprisonment. Defendant timely appealed.

¶ 191                                    II. ANALYSIS

¶ 192   At issue in this appeal is whether defendant was denied a fair trial and whether the evidence was sufficient to support his conviction of first-degree murder.

¶ 193   Before turning to those contentions, we address the State's request that we strike or disregard portions of defendant's Statement of Facts that fail to comply with Illinois Supreme Court Rule 341(h)(6) (eff. Oct. 1, 2020). Rule 341(h)(6) provides that the Statements of Facts "shall contain the facts necessary to an understanding of the case, stated accurately and fairly without argument or comment." We agree with the State that defendant's Statement of Facts repeatedly veers into improper argument, asserting conclusions or comments on disputed factual issues. Moreover, certain stylistic flourishes—such as the use of scare quotes in the following heading from page 12 of defendant's brief: The State's "Evidence"—are unappreciated and do not comport with a fair and accurate presentation of the pertinent facts without comment. We understand that counsel seeks to be a zealous advocate, but supreme court rules governing appellate briefs are not mere suggestions. *Hall v. Naper Gold Hospitality LLC*, 2012 IL App (2d) 111151, ¶ 7. Although we decline to strike defendant's Statement of Facts, we admonish counsel's noncompliance.

¶ 194                                    A. Fair trial

¶ 195   Defendant argues that the trial court committed several errors at his retrial and that, due to these cumulative errors, he was denied his right to a fair trial.

¶ 196              1. Whether the trial court improperly cited to a jury instruction

¶ 197   The first error defendant argues relates to Illinois Pattern Jury Instructions, Criminal, No. 7.15 (hereinafter IPI Criminal No. 7.15), in that the instruction should be viewed only when multiple events may cause a homicide, not when there are two competing and independent theories

of the cause of death. He contends that application of this instruction improperly shifted the burden of proof to him to disprove that he strangled Kathleen. He continues that even if IPI Criminal No. 7.15 was proper, the trial court erred by shifting the burden of proof to the defense on its theory of a sudden cardiac death. Defendant argues that the State had an obligation to prove beyond a reasonable doubt that Kathleen did not die of binge drinking, but that it did not offer any testimony to refute Kanagasundram's opinion testimony on the matter.

¶ 198   First and foremost, we note that this was not a jury trial in which IPI Criminal No. 7.15 was tendered to a jury. Rather, this was a bench trial in which the trial court cited IPI Criminal No. 7.15 in its memorandum opinion as part of the "general law" governing this case. Moreover, the citation to IPI Criminal No. 7.15 was entirely appropriate. See *People v. Nere*, 2018 IL 122566, ¶ 74 (holding, as a matter of law, that IPI Criminal No. 7.15 (Supp. 2011) properly set forth the principles of causation). IPI Criminal No. 7.15 is entitled "Causation In Homicide Cases Excluding Felony Murder" and the committee note provides that the instruction should be given "whenever causation is an issue under Section 720 ILCS 9-1(a)(1) (intentional murder), 9-1(a)(2) (knowing murder), or 720 ILCS 5/9-3(a) (involuntary manslaughter and reckless homicide)." Here, defendant was charged under sections 9-1(a)(1) and (a)(2), and thus the instruction would have been proper to give in a jury trial and was an accurate statement of the law on causation at the bench trial.

¶ 199   IPI Criminal No. 7.15 provides that the State must prove beyond a reasonable doubt that the defendant's acts "were a contributing cause of the death" and that the victim's death "did not result from a cause unconnected with the defendant," but that it is not necessary that the defendant's acts were the sole and immediate cause of the victim's death. The fact that defendant in this case argued an independent cause of Kathleen's death in no way renders the general law

expressed in IPI Criminal No. 7.15 inapplicable. Rather, the instruction makes clear that the State maintains the burden of proof on the element of causation, and the death cannot be unconnected with the defendant's conduct, *i.e.*, the death cannot be unforeseeable. See *People v. Nelson*, 2020 IL App (1st) 151960, ¶ 126 (explaining that IPI Criminal No. 7.15's statement that a victim's death not result from a cause unconnected with the defendant means that "[t]he State must prove that the successive, immediate cause of death was of a type that was sufficiently foreseeable in the natural sequence of events put into motion by defendant's conduct that it would not be unfair to hold the defendant criminally liable for the death."). In short, the law expressed in IPI Criminal No. 7.15 supported that the State bore the burden of proving beyond a reasonable doubt that defendant caused Kathleen's death by strangling her, and if the court believed that she died of a sudden cardiac arrythmia unconnected to defendant's conduct, it would have failed to carry its burden on the element of causation.

¶ 200 There is no support for defendant's contention that the trial court's citation to IPI Criminal No. 7.15 improperly shifted the burden of proof to defendant on the element of causation. Causation is an element of homicide that the State must prove beyond a reasonable doubt (*Nelson*, 2020 IL App (1st) 151960, ¶ 48 ("One element of first-degree murder is causation.")), and the trial court found that the State proved *all* elements of first-degree murder beyond a reasonable doubt, including the element of causation. To wit, the court believed the State's theory of the case and disbelieved defendant's, finding that Kathleen died of asphyxiation caused by pressure applied to her neck and that defendant was the only person with motive, means, and opportunity to cause her death.

¶ 201 Finally, defendant's theory of Kathleen's cause of death is not an affirmative defense to first-degree murder, which would require the State to disprove the defense beyond a reasonable

doubt. See *People v. Bardsley*, 2017 IL App (2d) 150209, ¶ 17. An affirmative defense presupposes the defendant's guilt and provides a ground to wholly or partially excuse the defendant from criminal responsibility; it is not an attack on the State's proof. *People v. Valdez*, 2022 IL App (1st) 181463, ¶ 117. Defendant's theory did not presuppose his guilt. Instead, his theory offered an alternative, criminally blameless explanation that, if believed over the State's theory of causation, would defeat the State's proof that defendant caused Kathleen's death. Accordingly, the State had no obligation to disprove defendant's theory beyond a reasonable doubt. See *People v. Pintos*, 133 Ill. 2d 286, 291 (1989) (recognizing Illinois's rejection of the "reasonable hypothesis of innocence" test); *People v. Larson*, 379 Ill. App. 3d 642, 654 (2008) (stating that "[t]he State is not required to exclude every reasonable hypothesis of innocence," and "[p]roof of guilt beyond a reasonable doubt does not require proof beyond any possibility of doubt").

¶ 202          2. Whether the trial court accurately recalled the defense theory

¶ 203   Defendant next argues that the trial court erred in failing to accurately recall the defense theory that Kathleen suffered a sudden cardiac arrhythmia as the result of binge drinking and that defendant was not involved in her death. He argues that the trial court misconstrued the defense theory, believing that the theory was that defendant was not culpable if Kathleen could have been resuscitated at the scene of the crime instead of the actual theory that defendant had nothing to do with Kathleen's death.

¶ 204   This argument is directly rebutted by the trial court's written decision, wherein the trial court accurately recalled and rejected the defense theory that Kathleen died as a result of binge drinking and defendant could not have moved her to the track by himself. The court wrote, "I find the theory offered by the Defense that Kathleen King's death was Sudden Cardiac Death brought

on by binge drinking, with physical injuries caused by a fall on railroad track, not credible and is contrary to the physical injuries on her body."

¶ 205                    3. Whether the trial court ignored defense evidence

¶ 206   Defendant further argues that the trial court ignored certain defense evidence from three witnesses: Schiff's testimony about Kathleen's cell phone locations, Palenik's testimony about the trace material evidence on Kathleen's shoes, and Gussow's testimony about her intoxication level. We address the trial court's consideration of each in turn.

¶ 207   Defendant is correct that, in its written decision, the trial court did not address Schiff's testimony regarding Kathleen's cell phone ping data. However, a trial court presiding in a bench trial "is not required to mention everything—or for that matter, anything—that contributed to its verdict." *People v. Curtis*, 296 Ill. App. 3d 991, 1000 (1998). Even if we were to assume that the absence of commentary on Schiff's testimony meant that the trial court failed to consider the testimony, the evidence was not crucial to a defense, and any failure to recall it would be harmless. See *People v. Mitchell*, 152 Ill. 2d 274, 323 (1992) ("The trial court's failure to recall and consider testimony *crucial* to defendant's defense resulted in a denial of defendant's due process rights." (Emphasis added.)); see also *People v. Williams*, 2013 IL App (1st) 111116, ¶ 93 (due process violation was subject to harmless error review). Schiff's testimony provided two additional locations of Kathleen's cell phone: 300 South Glengarry Drive at 6:34 a.m. on July 6, 2014, with a margin of error of 165 meters, and 809 Oak Street in Geneva at 6:23 a.m., with a margin of error of 65 meters. Schiff admitted that these were just locations of Kathleen's cell phone and did not show who, if anyone, possessed the phone at that time, or whether or how the phone was moving at that time. Notably, both locations are in the same general vicinity as defendant's home, Esping Park, and the railroad track where Kathleen was found. Thus, the ping locations did not preclude

the State's theory of the case; rather, they were consistent with both the State's and defense's theories. That is, they could reasonably support that defendant moved Kathleen's body to the railroad tracks and that Kathleen moved herself to the tracks.

¶ 208   Although defendant argues that it is unbelievable that defendant could carry Kathleen from the 6:34 a.m. ping location to her resting place on the railroad track and escape before her discovery four minutes later, this suggestion is speculative and ignores several other facts and reasonable inferences therefrom. First, the location data was imprecise: the 6:34 a.m. ping had a significant margin of error of 165 meters,[7] which meant that Kathleen's cell phone could have been much nearer to the railroad track where she was found than to 300 South Glengarry Drive. Second, defendant testified he was 6 feet 4 inches tall and 275 pounds, and it is not so unbelievable that a man of his size could carry a woman approximately half his weight if necessary for the distances suggested in this case. And third, the ping evidence does not even show that the cell phone was in Kathleen's or defendant's possession at the time of the pings, meaning it is reasonable to believe that defendant could have already placed Kathleen on the tracks and simply retrieved the cell phone separately and moved it to the tracks between 6:34 a.m. and 6:38 a.m. Importantly, the testimony regarding the cell phone ping data provides nothing definitive about what occurred that morning,

_____

[7]In reviewing the several exhibits of notated aerial photographs of the railroad tracks and surrounding area (State's exhibits 100 and 100A, and defense exhibit 61b), it is difficult to pinpoint the precise location of the body in relation to 300 South Glengarry Drive, with the defense exhibit notating her body seemingly farther west along the railroad tracks than the State's exhibits. Regardless, as we explain, the body's distance from 300 South Glengarry Drive did not render it impossible for defendant to have placed her on the track by 6:38 a.m.

demonstrating that the evidence was not crucial to the defense and was harmless to ignore, if indeed the trial court failed to consider it.

¶ 209    Next, defendant argues that the trial court ignored Palenik's testimony regarding his examination of Kathleen's shoes. We disagree. The trial court accurately recounted Palenik's testimony, writing that the "objects" found on the bottom of her shoes were consistent with the ballast rocks found along railroad tracks and that walking was not required for the rocks to become embedded, only that the shoe contact the rocks. Palenik testified that the particles on Kathleen's shoes were the type one would expect to find on someone's shoes who walked on ballast rocks near train tracks, but he conceded on cross-examination that movement beyond walking, such as being set down on the rocks with her feet facing down could account for the material found on her shoes. In fact, he testified that some of the metal particles on Kathleen's shoes from the railroad tracks could "[e]asily" cling to her shoes. Moreover, he conceded that Kathleen could have picked up the material on her shoes by being near the railroad tracks days before her death and that the scuff mark on her shoe could have been preexisting.

¶ 210    Defendant's objection to the trial court describing a scuff on Kathleen's shoes as a "dragging mark" is an inconsequential semantic dispute. "Drag" can mean "to cause to move with slowness    or    difficulty"    (*drag*,    Merriam-Webster.com,    https://www.merriam-webster.com/dictionary/drag (last visited December 11, 2024)), which could have been how Kathleen was moving her feet immediately before and during a sudden cardiac event, if the trial court had believed that she had one. There is no reasonable reading of the trial court's decision that would indicate that it believed Palenik had testified that Kathleen was dragged by defendant. Rather, the court's summary of his testimony accurately recalled the unremarkable takeaway from

Palenik's testimony: Kathleen's shoes, which she was wearing when discovered lying on the railroad track, had been near railroad tracks.

¶ 211   Third, defendant argues that the trial court ignored Gussow's testimony on intoxication. Again, this contention is refuted by the trial court's written order. The trial court recounted that Gussow testified that Kathleen was severely intoxicated the evening and morning of her death and that her intoxication would have made running and dressing herself difficult. The court also correctly stated that Kathleen's level of intoxication, .15 BAC at her autopsy, was never in dispute, and it found that she had been drinking in the hours before her death. Gussow's testimony highlighted that Kathleen was intoxicated from drinking alcohol, but it did nothing more; for instance, he did not opine that Kathleen's level of intoxication caused her death or that it was impossible for another person to have dressed her.

¶ 212   In addition to defendant's arguments over the three aforementioned expert testimonies, he argues that the trial court "ignored the State's fabrication, concealment, misrepresentation of evidence[,] and introduction of immaterial evidence." For example, he claims the State presented a false "fat lip" theory about him, and that the State introduced a photograph of a wood shard from defendant's bathroom floor despite the damage to the wood frame being preexisting. Even if we were to agree that the State acted improperly, which we do not, we fail to see any possible harm here when, as defendant puts it, the trial court *ignored* the State's purported errors. We presume the trial court considered only proper argument and admissible evidence at a bench trial. *People v. Pelegri*, 39 Ill. 2d 568, 575 (1968) (referencing the "soundly based presumption that the court in a bench trial relies only on proper evidence and argument"); see also *People v. Adams*, 2023 IL App (2d) 220061, ¶ 108. The trial court's decision contains nothing that would rebut this presumption;

nowhere in its written order did the court reference the claimed errors, including the fat-lip theory and the photo of the wood shard.

¶ 213   For the aforementioned reasons, we find no due process violation in the trial court's recall of the cited defense evidence, nor any error arising from the challenged State's evidence.

¶ 214        4. Whether findings were against the manifest weight of the evidence

¶ 215   Defendant's next contention of error is that the trial court made several critical findings that were against the manifest weight of the evidence, including its credibility determinations regarding several expert witnesses. A trial court's factual findings in a bench trial will not be reversed unless they are against the manifest weight of the evidence. *People v. Harris*, 2015 IL App (1st) 133892, ¶ 20. A finding is against the manifest weight of the evidence when it is unreasonable. *People v. Tennort*, 2023 IL App (2d) 220313, ¶ 15. In a bench trial, it is the trial court's responsibility to determine the credibility of witnesses and weigh the evidence, and we will not substitute our judgment on questions involving the weight of the evidence or the credibility of witnesses. *People v. Vasser*, 331 Ill. App. 3d 675, 688-89 (2002). We give great deference to trial judges when they hear the evidence and observe the witnesses. *People v. Austin*, 328 Ill. App. 3d 798, 804 (2002); see also *People v. Soskin*, 2021 IL App (2d) 191017, ¶ 41 ("The trial court's credibility determinations are entitled to great weight on appeal."). When considering the trial court's ultimate finding of guilt, we view the evidence in the light most favorable to the State and ask whether any rational trier of fact could have found all the essential elements of the crime beyond a reasonable doubt. *Harris*, 2015 IL App (1st) 133892, ¶ 20.

¶ 216   Defendant first argues that it was error to find both Smock and Kalelkar credible because their testimonies were "glaringly contradictory," including that Smock opined that Kathleen experienced suffocation, whereas Kalelkar did not, and Kalelkar never specified that Kathleen was

the victim of *manual* strangulation. He argues that it was impossible to find both experts credible based on the differences in their testimonies.

¶ 217    We reject this argument, as the trial court reasonably found both experts' opinions credible on Kathleen's cause of death. Both experts opined that Kathleen died of asphyxiation as a result of pressure applied to her neck and that her death was not consistent with a fall on the railroad tracks or positional asphyxiation.[8] There is nothing contradictory about Smock providing a more specific method of asphyxiation and pressure to Kathleen's neck than Kalelkar. Contradictory testimony would be, for example, if Kalelkar definitively opined that Kathleen could not have died of manual strangulation when Smock opined that Kathleen must have died of manual strangulation. Or, as a more glaring example of contradictory testimony, the trial court could not have reasonably believed expert testimonies that Kathleen died due to asphyxiation as a result of pressure applied to her neck and that she died as a result of cardiac arrythmia brought on by binge drinking but not by any physical intervention by defendant. In other words, the actual conflict in the evidence was whether to believe the expert opinions of the State or the defense.

¶ 218    In addition to defendant contending that it was error to simultaneously credit Smock's and Kalelkar's testimonies, he argues it was error to discredit Blum's and Kanagasundram's

---

[8]Regarding the differences between Kalelkar's and Smock's testimonies, defendant's brief makes several misleading claims. For instance, he writes that Smock opined there was suffocation but that Kalelkar testified there was no suffocation, when, in fact, Kalelkar testified that she had not offered an opinion on whether Kathleen was suffocated. He also argues that, while Smock found injuries to Kathleen's neck, including bruising, Kalelkar stated there were no injuries on Kathleen's neck, when the question posed to Kalelkar at trial was "would you agree that the only mark on her neck, *other than the bruises*, that you could correlate with the strangulation is this *** red stripe," (emphasis added) and she replied, "[c]orrect."

testimonies. Regarding Kanagasundram's testimony, defendant argues that the trial court was "acting as an advocate for the State" by incorrectly citing additional instances where Kathleen had been drinking and ignoring evidence of Kathleen not drinking. He also argues that it was error to discredit him for not connecting Kathleen's physical injuries to his opinion on her cause of death. As for Blum, he argues that any changes in his testimony between the first and second trial were "immaterial" or presented new evidence, and he takes issue with the trial judge stating that Blum claimed not to see any injury in a photograph of Kathleen, presumably of the tip of her tongue, asserting that the judge had "no expertise in injury pattern analysis."

¶ 219 Defendant's arguments are unavailing. The trial court reasonably viewed Kanagasundram's testimony in light of other credible evidence in the case. Kanagasundram's own testimony was that persons unused to drinking are more susceptible to a cardiac arrythmia as a result of drinking, and the record is clear that Kanagasundram was unaware of defendant's testimony that Kathleen had been drinking more since returning from Army training and of Kristine's testimony that Kathleen had drank four or five beers on Father's Day. Furthermore, it was entirely reasonable for the court to discredit Kanagasundram's testimony on the basis that there was evidence that Kathleen had physical injuries, including petechial hemorrhaging and various bruising, that were not explained merely by her experiencing cardiac arrest because of binge drinking.

¶ 220 As to Blum's testimony, his critical opinions stood in direct contrast to Smock's and Kalelkar's, including his opinion that Kathleen did not experience an asphyxial death but instead died of a sudden cardiac arrythmia. It would have been inconsistent for the trial court to credit Blum's opinion while at the same time believing the opinions of the State's experts, and we have already explained that it was reasonable for the court to credit Smock's and Kalelkar's testimonies.

Moreover, the court did not discredit Blum simply because of inconsistencies in his testimony between cases; critically, it also explained that his opinions did not credibly explain significant injuries to Kathleen. The only way for us to decide in defendant's favor on this issue would be to substitute our judgment for that of the trial court's, which we must not do. *People v. Deleon*, 227 Ill. 2d 322, 332 (2008). As to the photograph of Kathleen's tongue, we find no error in the court commenting that Blum did not see an injury in the photograph that the trial court clearly saw. The court was the trier of fact, and it was not required to blindly credit Blum's testimony and ignore what it saw. Moreover, Smock testified to an injury at that location, and it was the court's job to resolve conflicts in the competing expert testimonies.

¶ 221   Defendant next argues that it was manifestly erroneous to find that Kathleen died of asphyxiation due to pressure to her throat and mouth and that Kathleen was dressed by someone else and placed on the railroad track. The parties in this case presented competing theories on Kathleen's cause of death, and defendant's argument again asks us to reweigh the evidence and substitute our judgment for that of the trial court on matters of credibility, which we will not do. *People v. Brennan*, 2023 IL App (2d) 220190, ¶ 47. As detailed extensively in our background, the State provided evidence from which a reasonable trier of fact could conclude that Kathleen died of asphyxiation, including the opinions of two expert witnesses. The State also provided evidence reasonably supporting that she did not die at the railroad tracks but instead was placed at the scene, including her manner of dress, with her bra twisted and hiked up, which is consistent with someone carrying her; her body's and her phone's positions on the track, which placed them in danger of being struck by a passing train; and the presence of leaf fragments in her hair, which was consistent with those found in the home, and under her shorts, which was consistent with her being dressed and moved to the track by another. Given the facts of this case, we cannot say it was

manifestly erroneous for the trial court to find that Kathleen died of asphyxiation and that she was subsequently placed on the railroad track by someone else.

¶ 222    Defendant further disputes the trial court's finding on motive and opportunity, arguing first that it was improper to base his motive on his contemplation of a divorce. See *People v. Davis*, 278 Ill. App. 3d 532, 541-42 (1996) (a pending divorce case alone cannot support a motive to kill a spouse). Here, however, the court did not base its finding on defendant simply considering a divorce. See *id.* at 542 ("[B]efore a pending divorce may be said to establish a reasonable inference of motive to commit murder, the facts surrounding the pending divorce must be examined and assessed."). Instead, it found that defendant was "angry, suspicious[,] and believed his marriage was disintegrating." The evidence adduced at trial supported a reasonable conclusion that defendant was bothered by Kathleen's relationship with Billy. Defendant's own testimony was that he knew "something was going on," that he was "hurt," and that, after he took her phone and texted Billy from it on the day she died, he told Kathleen that she needed to "make a decision." In short, defendant's motive was not simply about a divorce, which Kathleen said she did not want, but rather was about his suspicions that his wife was unfaithful.

¶ 223    As to the trial court's finding on opportunity, the salient and undisputed takeaway is that defendant was, by his own admission, at his and Kathleen's home on the morning of July 6, 2014, when Kathleen died. He even testified that Kathleen left the home sometime around or shortly after 6 a.m., which he believed was to go for a walk or a run. His presence at home with Kathleen on the morning of her death is evidence by which the trial court could reasonably conclude he had an opportunity to murder her. Even if the timeframe or circumstances made his alleged actions difficult, it did not render them impossible.

¶ 224   Defendant's final contention is that the trial court erred in finding that defendant posted online in a manner inconsistent with his trial testimony. In its decision, the trial court wrote that:

"I find the Defendant's testimony at trial and his statements to police to be inconsistent with his actions as portrayed by his computer searches, social media searches *and postings*.

His testimony and interviews display someone trying to deal with marital issues while his activity shows someone distrustful of his wife ***

His statements and testimony, at times, are inconsistent with the facts elicited from the records of computer searches, telephone records and other evidence.

I find the Defendant's testimony not credible." (Emphasis added.)

The important takeaway from the trial court's decision is that the court, having observed defendant's testimony and having presided over the rest of the trial, found his testimony incredible. This finding was reasonable. For instance, defendant denied being jealous of other men and denied being angry with Kathleen, but the evidence showed that he did things like repeatedly accessing their Chase bank account to try to figure out where Kathleen was on June 22, making many online searches for Billy, and throwing her phone in a pond over her texting too much.

¶ 225   For all these reasons, we find that the trial court's findings were not against the manifest weight of the evidence.

¶ 226          5. Whether the trial court assumed the role of an expert

¶ 227   Defendant contends that the trial court improperly assumed the role of an expert by determining that Kathleen had built up a tolerance to alcohol. This argument is also contradicted by the trial court's written decision. The trial court wrote:

"Dr. Kanagasundram was aware of [Kathleen]'s drinking the day and evening before her death and another incident prior to her death where [Kathleen] fell ill after drinking. Dr. Kanagasundram was not aware of a few other incidents of drinking and was unaware of the Defendant's comments about [Kathleen]'s drinking.

The Defendant *** stated Kathleen was drinking more since her return from Army training. The Defendant also stated [Kathleen] started keeping large bottles of alcohol around the home.

The above was relevant as Dr. Kanagasundram testified that people unused to alcohol drinking were more disposed to Sudden Cardiac Death."

In this passage, the trial court was not assuming the role of an expert but instead was considering Kanagasundram's opinion in the context of the other evidence adduced at trial. To wit, Kanagasundram's own testimony was that binge drinking was "way worse for predisposition to cardiac arrhythmia" in those unused to regularly consuming alcohol, and the trial court merely stated that Kanagasundram was unaware of evidence of Kathleen's history of drinking in the months prior to her death, which was relevant to his opinion that Kathleen died of cardiac arrest as a result of binge drinking. At no point in its decision did the court say that Kathleen had built up a tolerance to alcohol. Instead, the court noted that Kanagasundram formed his opinion while unaware of all the relevant evidence of Kathleen's drinking and that, importantly, he failed to connect his opinions to Kathleen's physical injuries.

¶ 228          6. Whether the trial court relied on evidence outside of the record

¶ 229   Last, defendant argues that the trial court had no basis to find that the crime scene was staged other than an improper consideration of Safarik's testimony from defendant's first trial. We reject this argument.

¶ 230   On appeal from defendant's first trial, our supreme court stated that "an ordinary juror is fully capable of understanding and concluding that, given the condition of the body and nature of the scene, *** the crime scene was staged[,] and that generally speaking, strangers have no reason to stage a crime scene." *King*, 2020 IL 123926, ¶ 38. In fact, the supreme court concluded that much of Safarik's expert testimony from defendant's first trial was inadmissible precisely because conclusions such as those about staging a crime scene were clearly within the province of an ordinary juror to make.[9] *Id.* Here, just like an ordinary juror, the trial court as factfinder could look at the evidence from the scene, including the positions of Kathleen's body, clothes, and phone, and draw reasonable inferences such as that she and her phone were placed at the scene by someone else, *i.e.*, they were staged.

¶ 231   Consistent with our supreme court's opinion in defendant's first trial, the State argued in closing that the trial court did not need an expert to establish that the crime scene was staged, and it accurately stated that no State witness had testified that the scene was staged. In fact, we note that it was only the defense that explicitly broached the issue of staging at trial, eliciting Blum's opinion that Kathleen was not placed at the scene and asking both Officers Montgomery and Hann whether they believed the scene at the railroad tracks was staged (both officers answered in the negative). Given that the trial court was clearly permitted to infer from the evidence at retrial that the scene was staged, we have no basis to say it must have improperly relied upon expert testimony outside of the record.

---

[9]Safarik's testimony that fell within the ken of the average juror included that Kathleen would not have left her home without her earbuds and contacts, that Kathleen's cell phone was placed on the track by someone other than her, and that she died elsewhere and was moved to the railroad track. *Id.*

¶ 232                              7. Whether the claimed errors had a cumulative effect

¶ 233   Because we have found no individual errors, we find no cumulative effect of error amounting to the denial of a fair trial. *People v. Green*, 2017 IL App (1st) 152513, ¶ 118 ("There is generally no cumulative error where the alleged errors do not amount to reversible error on any individual issue."). Accordingly, defendant was not denied a fair trial.

¶ 234                              B. Sufficiency of the evidence

¶ 235   Having rejected defendant's arguments that he was denied a fair trial, we turn to his contention that the evidence at his bench trial was insufficient to convict him of first-degree murder. Defendant argues that the evidence was insufficient in several ways: that the evidence did not support that Kathleen was dead when found on the railroad track or that she died elsewhere other than at the train tracks; that Kalelkar's testimony on the cause of death was equivocal; that the State failed to refute the defense's theory of the cause of death; and that the State failed to connect defendant to her death.

¶ 236   On a challenge to the sufficiency of the evidence, we must determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. McLaurin*, 2020 IL 124563, ¶ 22. It is not the reviewing court's function to retry the defendant. *People v. Hall*, 194 Ill. 2d 305, 329-30 (2000). The trier of fact has the responsibility to assess witnesses' credibility, weigh their testimony, resolve inconsistencies and conflicts in the evidence, and draw reasonable inferences from the evidence. *People v. Sutherland*, 223 Ill. 2d 187, 242 (2006). A factfinder's decision to accept testimony is entitled to great deference (*People v. Cunningham*, 212 Ill. 2d 274, 280 (2004)), and a reviewing court will not substitute its judgment for that of the

factfinder on questions involving the credibility of witnesses or the weight of the evidence (*People v. Galarza*, 2023 IL 127678, ¶ 26).

¶ 237 The same standard of review applies whether evidence is direct or circumstantial, and circumstantial evidence alone can be sufficient to sustain a criminal conviction. *People v. Pollock*, 202 Ill. 2d 189, 217 (2002); see also *People v. Heep*, 302 Ill. 524, 529 (1922) (circumstantial evidence "is legal evidence and is oftentimes more reliable than direct evidence"). The trier of fact need not be satisfied beyond a reasonable doubt as to each link in the chain of circumstances; " '[i]t is sufficient if all of the evidence taken together satisfies the trier of fact beyond a reasonable doubt of the defendant's guilt.' " *Galarza*, 2023 IL 127678, ¶ 27 (quoting *Hall*, 194 Ill. 2d at 330). We will not reverse a criminal conviction based on insufficient evidence unless the evidence is so unreasonable, improbable, or unsatisfactory that it creates a reasonable doubt of the defendant's guilt. *People v. Murray*, 2019 IL 123289, ¶ 19.

¶ 238 Proof of an offense requires (1) that a crime occurred (the *corpus delicti*), and (2) that the crime was committed by the person charged. *King*, 2020 IL 123926, ¶ 53. "In a prosecution for murder, the *corpus delicti* consists of the fact of death and fact that death was produced by a criminal agency." *Id.* Specifically for first-degree murder under section 9-1(a)(1) or (2) of the Criminal Code of 2012 (720 ILCS 5/9-1(a)(1)(2) (West 2014)), the State must establish beyond a reasonable doubt that the defendant killed another without lawful justification and, in performing the acts which caused the death, intended to do great bodily harm or knew such acts would cause death to another, or knew that such acts created a strong probability of death or great bodily harm. Motive is not an essential element of first-degree murder. *People v. Anderson*, 2017 IL App (1st) 122640, ¶ 55.

¶ 239   Here, the evidence was sufficient to convict defendant of first-degree murder beyond a reasonable doubt. First, the evidence reasonably supported that Kathleen was dead at the scene. Metra workers Cavendar and Mongelli testified that Kathleen was not breathing when discovered on the railroad track. Officer Carbray likewise detected no signs of life in Kathleen, including no breathing, and he noted discoloration of her body consistent with lividity. Grandgeorge, the paramedic, did not attempt resuscitative measures because Kathleen was not breathing, had no pulse, and displayed lividity. He also related that his partner, who had touched Kathleen's body, had identified stiffness in her body. Furthermore, the testimony of the State's experts supported that Kathleen was dead at the scene and that her death was the result of criminal agency. Kalelkar opined that Kathleen died of asphyxiation caused by neck compression and not as a result of a fall or landing on the railroad track, and her position on the tracks was not consistent with positional asphyxia. Smock opined that Kathleen was assaulted, strangled, and suffocated, and that none of her injuries were consistent with falling at the railroad track or dying of positional asphyxia. He opined that she was "clearly deceased" when discovered because she displayed lividity, and he had never seen a person with lividity be resuscitated. Furthermore, he testified that Kathleen's PEA did not indicate that she was alive at the time of her EKG at 7:14 a.m. Accordingly, the trial court had sufficient evidence before it to find that Kathleen was deceased at the scene.

¶ 240   As to Kalelkar's testimony, we disagree that it was equivocal as to Kathleen's cause of death and, regardless, the trial court reasonably found Smock's unequivocal opinion on the cause of death credible as well. Kalelkar reviewed the evidence from Kathleen's autopsy in detail, and based on Kathleen's injuries, she opined that Kathleen died of asphyxiation caused by neck compression. This is not an uncertain opinion or one open to reasonable interpretation that Kathleen died of another cause such as a cardiac arrythmia brought on by binge drinking. Of note,

Kalelkar explained that Kathleen's petechial hemorrhages were a "very specific finding" given the circumstances of this case. She continued that the petechial hemorrhages were consistent with strangulation or compression of the neck or chest and were not consistent with her falling on the railroad track or with any medical condition she was aware of Kathleen having. In reaching its decision, the trial court noted that the opinions of the defense's experts, including Blum, did not account for Kathleen's injuries, and indeed, the defense experts offered no opinion on how Kathleen experienced petechial hemorrhaging in this case.[10]

¶ 241    Next, we have already determined that the State was not required to disprove the defense's theory that Kathleen died of a cardiac arrythmia caused by binge drinking. See *supra* ¶ 201. The State and the defense presented different theories of Kathleen's cause of death, and it was for the trial court to weigh the evidence, resolve inconsistencies in the evidence, and assess witness credibility in deciding whether Kathleen died due to criminal agency. The court found the State witnesses credible, and it specifically found that the defense theory was contrary to Kathleen's physical injuries. It also looked at the resting positions of Kathleen's body and phone and determined that they were placed in a manner that the phone and evidence of strangulation would likely be destroyed by a passing train, which benefited defendant. This was precisely the type of determination about staging that our supreme court said was within the province of the factfinder to make. See *King*, 2020 IL 123926, ¶ 38. Further evidence supporting the trial court's reasonable conclusion on staging was Kathleen's manner of dress, with a twisted, hiked-up bra and loose shorts; only dry dirt and no mud on her shoes, despite the ground being soft and moist that morning and responders like Antenore getting mud on their footwear; her lack of earbuds, armband,

---

[10]Blum rejected any association between asphyxia and petechial hemorrhaging.

contacts, or glasses; and the fact that the Metra employees testified they had never seen a person running on ballast rocks near the train tracks, which would be a difficult surface to run on and was inconsistent with Brandon's testimony that his mother did not run along the tracks. We will not substitute our judgment for that of the trial court, and we have no basis in the record to hold that the court's acceptance of the State's theory was unreasonable.

¶ 242   Finally, there was sufficient evidence to support defendant's connection to Kathleen's death. By defendant's admission, he was the only person with Kathleen early on the morning of her death, and Kurt testified that defendant told him that he and Kathleen had been fighting that morning and that she went for a run at 6:30 a.m. to clear her head. That morning, defendant had taken Kathleen's phone, on which he discovered "an unending crap load of messages," and he was "hurt" by her relationship with Billy, who he testified was "obviously, you know, more than a friend." He admitted to texting Billy 11 times from her phone between 4:18 a.m. and 4:57 a.m. Prior to that night, he had told Tim that he would not be attending his and Kristine's wedding because he and Kathleen were having marital problems, and he had broached the topic of a divorce with Kathleen. Further, there was expert testimony that Kathleen's physical injuries were consistent with her being grabbed (the bruising pattern on her left arm, in particular the inner part of the arm) and strangled (trauma to her neck; internal and external petechial hemorrhaging, including in the eyes; and Smock's testimony as to venous congestion on her right check and lateral neck). The State's experts explicitly rejected alternative explanations of the cause of death, such as a fall at the railroad track and positional asphyxiation. Although defendant points to additional evidence or the lack thereof—including the two additional cell phone pings identified by Schiff, the lack of DNA testing, and the fact that no witness saw defendant moving Kathleen's body that

morning—nothing defendant identifies renders unreasonable the court's acceptance of the State's theory of the case given the totality of the evidence adduced at retrial.[11]

¶ 243   In sum, the State presented ample evidence that Kathleen's death was the product of criminal agency in that she died of asphyxiation caused by neck compression, *i.e.*, strangulation, and that defendant had the motive, means, and opportunity to commit her murder. Accordingly, we cannot say the trial court's guilty finding was so unreasonable, improbable, or unsatisfactory that it creates a reasonable doubt as to defendant's guilt.

¶ 244                                III. CONCLUSION

¶ 245   For the reasons stated, we affirm the judgment of the circuit court of Kane County.

¶ 246   Affirmed.

---

[11]We have already explained that Schiff's testimony did not provide crucial evidence, that is, the type of evidence that, if believed, would have necessarily supported the defense's theory of the case over the State's. See *supra* ¶¶ 207-08.